1 iSULLIVAN, Judge.
John Ceaser, Jr. filed suit for personal injuries sustained when his pickup truck flipped over after a vehicle driven by Richard Stiner struck it from the rear. After a bench trial, the trial court awarded Mr. Ceaser $8,275.97 in past medical expenses and $30,000.00 in general damages. Only Mr. Ceaser has appealed. He assigns two errors concerning the trial court’s failure to award future medical expenses and one error concerning the amount of general damages. Because we find that the record clearly supports an award of future medical expenses, we amend the judgment as explained below.
^Discussion of the Record
The accident occurred on November 15, 1995 in Oberlin, Louisiana. Mr. Ceaser, then fifty-three years old, had stopped on Louisiana Highway 165 to turn left onto Martin Luther King Drive when he noticed “a cloud of dust” approaching in his rear view mirror. Mr. Caesar was unable to avoid the collision because of oncoming traffic, and he lost consciousness upon impact. When he awoke, he was upside down in his truck, suspended by his seat belt. A bystander released him by cutting the seat belt, and an ambulance transported him to Oakdale Community Hospital. The investigating officer, Assistant Police Chief Charles Slate, noted that both vehicles were pointing south on Highway 165, with the Ceaser vehicle upside down and damaged across its entire rear end and roof. *613 The Stiner vehicle was damaged only in the front. Assistant Chief Slate did not observe any skid marks on the highway, and he reported that Mr. Ceaser complained of moderate injuries at the scene.
Mr. Ceaser sought treatment from Dr. Willie Jagneaux, a chiropractor, on November 20, 1995, five days after the accident. At his initial examination, Dr. Jagneaux noted muscle spasm and restriction of all ranges of motion in the cervical spine and muscle spasm and tenderness in the lower back. X-rays taken by Dr. Jagneaux revealed degeneration at C6-7 and loss of the normal cervical curve. Thereafter, Dr. Jag-neaux regularly treated Mr. Ceaser with vertebral adjustments or manipulations and electrical muscle stimulation. Although he released Mr. Ceaser to return on an as needed basis in August of 1996, Dr. Jag-neaux was not pleased with Mr. Ceaser’s progress. In December of 1996, Dr. Jag-neaux referred Mr. Ceaser to RDr. Scott Fillmore, a physical medicine and rehabilitation specialist practicing in Houston, Texas.
Dr. Fillmore, who testified by deposition, first examined Mr. Ceaser on December 11, 1996. Dr. Fillmore noted spasm in the neck, left and right shoulder, and lower back, with restriction of motion in the cervical and lumbar areas. He ordered an MRI of the cervical and lumbar spine, which he interpreted as revealing “significant” findings. The radiologist’s summary of the cervical results reads as follows:
The cervical intervertebral discs are all desiccated and degenerated. There is a broad-based herniation lateralizing to the left at C2-3. A broad-based herniation without lateralization is noted at C3-4. At C5-6, there is a herniation lateralizing to the left, and, at C6-7, a herniation lateral-izes to the right. Abnormally increased signal with T2 weighting in the right side of the cord at the C3-4 interspace level is present. The cord otherwise appears normal in size and signal. There is canal stenosis beginning at the C3-4 interspace level and extending caudally to C6-7. The greatest degree of cord impingement is at C3-4.
Concerning the lumbar spine, the radiologist reported:
There is diminished signal in all lumbar intervertebral discs with relative sparing of L2-3. There is a retrolisthesis of LI on L2 with central disc bulging at L3-4, broad-based posterior disc herniation at L4-5, and central disc herniation at L5-S1. Facet joint degenerative changes are noted bilaterally at Ll-2, L2-3, and L3-4. Hy-pertrophic stenosis is most pronounced at L4-5. The conus is in the expected location. The description of these findings assumes a normal count of five lumbar type vertebrae.
Dr. Fillmore believed that the abnormality at C3-4 was caused by the accident, noting that such spinal cord damage is seen only with serious trauma. He believed that the findings at C5-6 and C6-7 were aggravated by the accident and needed to be watched. He also said that the arthritic changes in Mr. Ceaser’s spine were “certainly” either started or accelerated by the accident.
|4Pr. Fillmore administered a series of injections to the lumbar paraspinal muscles on April 30, 1997. He prescribed pain and anti-inflammatory medications, and he recommended continued treatment with Dr. Jag-neaux. At the next visit with Dr. Fillmore, on September 16, 1997, Mr. Ceaser reported that the injections afforded only temporary relief. At that time, Dr. Fillmore observed that Mr. Ceaser walked with a painful gait pattern and that he had slight loss of reflexes. Dr. Fillmore considered these findings consistent with further degeneration and increased inflammation. He believed that Mr. Ceaser suffered from a chronic, long-term condition with only a “guarded prognosis” of improvement. Dr. Fillmore recommended yearly follow-up examinations to ensure that Mr. Ceaser remained neurologically stable, and he outlined a future course of treatment that included exercise programs, continued chiropractic care, and additional trigger point injections, either in his office or in a hospital.
At trial, Mr. Ceaser testified that he is in pain everyday, although some days are worse than others. He can continue working as a “chip operator” for Boise Cascade because his job does not require a “pulling effort” on *614 his part. He continues to see Dr. Jagneaux, but the longer he goes without treatment, the worse his pain becomes. He testified that his pain is currently worse that it was a year ago and that he began to experience numbness in his fingers about one week before trial.
In response to defense counsel’s objection, the trial court refused to admit Dr. Fillmore’s opinion on whether Mr. Ceaser would require future surgical treatment, finding that question to be beyond Dr. Fillmore’s expertise. In his deposition, Dr. Fillmore spoke of “a very good chance or possibility” that Mr. Ceaser would require a future cervical fusion.
[ ¿Ruling in Mr. Ceasar’s favor, the trial court made the following findings in its written reasons for judgment:
The testimony produced at trial indicates that Mr. Ceaser suffers from neck and lower back pain as a result of this accident. He suffers from thoracic and lumbar strain syndrome that reached maximum medical improvement in August of 1997, approximately one year and nine months post-accident. Trial testimony further revealed that as a result of the subject accident, Mr. Ceaser suffered a shifting and slippage of vertebrae at level Ll-2 and that he suffered herniating discs at the L3-j and Lj-5 levels. Additionally, from the accident, Mr. Ceaser suffered inflamation [sic] in the spinal cord and facet joint.

The testimony made clear that Mr. Ceaser is expected to suffer pain for the rest of his life because of the injuries received in the subject accident and that he can no longer perform strenuous activities such as lifting some objects.

(Emphasis added.)
Future Surgery and Medical Expenses
Mr. Ceaser first argues that the trial court erred in not admitting Dr. Fillmore’s expert opinion regarding the need for future surgery. We agree that the trial court should have admitted this testimony, finding that the objection regarding Dr. Fillmore’s expertise pertains to the weight of the evidence rather than its admissibility. However, after a de novo review of the record on this issue, we find Mr. Ceaser did not prove by a preponderance of the evidence that he will need future surgery.
In Sattler v. Hammond, 93-1227, p. 4 (La. App. 3 Cir. 5/4/94); 640 So.2d 570, 573, writ denied, 94-1418 (La.9/16/94); 642 So.2d 198 (citations omitted)(emphasis added), we stated the following concerning the admissibility of expert testimony:
Although LSA-C.E. art. 702 et seq. has generally relaxed heretofore stringent requirements before witnesses may qualify as experts, greatly facilitating the use of expert testimony, the trial court still retains broad discretion as to whether expert testimony should be | (¡admitted, particularly in jury trials. However, generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect or weight to be given such testimony, not to its admissibility. We are of the opinion that the trial court should have allowed Dr. Seiden [a psychiatrist] to testify on the effects of stress on the heart. The failure to do so was not harmless error.
Dr. Fillmore testified that his specialty of physical medicine and rehabilitation concerns the non-surgical treatment of muscle, bone, tendon, and ligament injuries. It is evident from the record that, although Dr. Fillmore does not perform surgery, he is qualified by training and experience to diagnose a surgical problem. Nonetheless, the record also demonstrates that the need for future surgery is merely speculative. Dr. Fillmore said that there was a “good chance or possibility” that Mr. Ceaser would require future surgery and that he would develop radiating pain, given the severity of the MRI findings. Yet, Dr. Fillmore did not recommend that Mr. Ceaser be evaluated by an orthopedic surgeon; his projected treatment plan included only an exercise program, continued chiropractic care, and additional trigger point injections. At trial, Mr. Ceaser did report that he recently experienced numbness in his fingers. Although this testimony confirms Dr. Fillmore’s prediction of additional radiating symptoms, the record still *615 does not establish that surgery is a necessary medical treatment.
Mr. Ceaser next argues that the trial court erred in failing to award any future medical expenses, given the trial court’s finding that he would be in pain for the rest of his life and the uncontradicted medical testimony that future care is necessary.
Both Dr. Jagneaux and Dr. Fillmore recommended continued conservative care. Dr. Jagneaux testified that chiropractic treatment was necessary to slow the degenerative process and to achieve maximum range of motion in joints. He estimated the cost of this care to be between $800.00 and $1,000.00 per year. |7Pr. Fillmore concurred in the recommendation for future chiropractic care, but he also believed that Mr. Ceaser would benefit from an exercise program and, possibly, additional trigger point injections. Dr. Fillmore could administer lumbar injections in his office, but cervical injections could only be performed by an anesthesiologist in a hospital at a cost of approximately $5,000.00. At the very least, Dr. Fillmore recommended a yearly examination to ensure that Mr. Ceaser remains neurologically stable.
In Hopstetter v. Nichols, 98-185, p. 9 (La.App. 5 Cir. 7/28/98); 716 So.2d 458, 462 (citations omitted), the fifth circuit stated the following regarding future medical expenses:
In order to recover future, medical benefits, the plaintiff must prove that these expenses will be necessary and inevitable. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable costs. However, when the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award.
In Hopstetter, the plaintiff suffered an aggravation of cervical arthritis and a possible herniation at C4-5 in a forceful rear-end collision. The appellate court found manifest error in the failure to award future medical expenses where the plaintiff had reached maximum medical improvement by the time of trial, but a chiropractor and a neurosurgeon recommended continued physical therapy and chiropractic care because they believed the plaintiffs condition was not likely to resolve itself. After considering testimony that the cost of the recommended treatment would be approximately $1,248.00 per year, the appellate court awarded the fifty-four-year-old plaintiff $12,480.00 for ten years of future care.
18In the instant case,'Mr. Stiner and his insurer, Allstate Insurance Company, argue that Mr. Ceasar’s injuries could not have been severe because he missed only twenty-five and one-half hours of work due to the accident. Defendants also argue that the trial court was free to reject the medical testimony on this issue, even though that testimony was uncontradicted.
Mr. Ceasar explained that his job does not require great physical effort: he spends most of his work day standing and “pushing buttons.” Additionally, he has been able to schedule his medical visits on Mondays, his regular day off of work. Although we agree that a trial court may discount uncontradict-ed testimony, we find, in the present case, that that testimony is supported by objective medical evidence. We also note that Mr. Ceaser’s documented injuries, which include spinal cord damage, a retrolisthesis, and multiple herniations, are more severe than those in Hopstetter. After considering the uncon-tradicted medical testimony, the severity of the objective medical findings, and the trial court’s findings of fact, we agree that the trial court erred in cutting off Mr. Ceasar’s medical expenses at the date of trial. We find that the record supports an award of $10,000.00 in future medical expenses.
General Damages
In his final assignment of error, Mr. Ceasar argues that the general damage award of $30,000.00 is inadequate.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the supreme court stated that “an appellate court should rarely disturb an award of general damages.” The supreme court further directed that, in reviewing an award of general damages, the appellate court must first determine “whether the par- *616 tieular trier of fact abused its discretion |9in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case.” Id. at 1260. Further, “[ojnly after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.” Id. After reviewing the particular facts and circumstances of the present case, which we have fully discussed above, we find no abuse of discretion in the trial court’s award of general damages.
Decree
For the above reasons, the judgment of the trial court is amended to include an award of $10,000.00 in future medical expenses. In all other respects, the judgment is affirmed. Costs of this appeal are assessed one-half to plaintiff, John Ceasar, Jr., and one-half to defendants, Richard Stiner and Allstate Insurance Company.
AFFIRMED AS AMENDED.