855 So.2d 781 (2003)
Michael BONIN, et al.
v.
FERRELLGAS, INC., et al.
No. 02-1031.
Court of Appeals of Louisiana, Third Circuit.
August 6, 2003.
Order Granting Rehearing in Part October 1, 2003.
*788 Michael C. McMullen, Kansas City, MO; and Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles, LA, for Intervenor/Appellant, Ferrellgas, Inc.
J.B. Jones, Jr., Jennifer Jones Bercier, The Jones Law Firm, Cameron, LA; Philip G. Hunter, Hunter & Morton, Alexandria, LA, for Plaintiffs/Appellants, Brent Michael Benoit, Clara Benoit, as tutrix of Ashley Shay Benoit, Herman R. Benoit, Michael Bonin, Keisha Marke Leger Stevens, as tutrix of Christopher Leger, Clarence W. and Sally Britt, William John Britt, Jeffery W. Kebodeaux, Loyce Kebodeaux, Wilfred W. Kebodeaux, Alice Mae Perez, John Perez, Joseph Stephen Perez, Jr., Angela Thibodeaux, Melvin Thibodeaux, Mildred Thibodeaux.
John W. deGravelles, deGravelles, Palmintier, Holthaus & Fruge, Baton Rouge, LA; and Daniel Keith Wall, Marcantel & Marcantel, Jennings, LA, for Plaintiffs/Appellants, Angela Thibodeaux, Mildred Thibodeaux, Melvin Thibodeaux.
Michael Hyman, Hyman Law Firm, Baton Rouge, LA, Edgar Dean Gankendorff, Oats & Hudson, New Orleans, LA, for Intervenors/Appellants, Continental Casualty Insurance Company, Wright Enrichment, Inc.
Michael J. Remondet, Jr., Peter B. Derouen, Jeansonne & Remondet, Lafayette, LA, for Intervenors/Appellants, Ferrellgas, Inc., TIG Insurance Company.
Louis C. LaCour, Jr., Adams and Reese, New Orleans, LA; John E. McElligott, Jr., Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette, LA; and Steven G. Emerson, Thomas H. Davis, Stinson, Morrison, Hecker, LLP, Kansas City, MO, for Defendants/Appellees, Empiregas Inc. of Lake Charles, Empiregas Corporation, National Union Fire Insurance Company of Pittsburgh, Pennsylvania.
Larry A. Stewart, Stafford, Stewart & Potter, Alexandria, LA; David R. Frohn, Frohn & Thibodeaux, Lake Charles, LA, for Defendant/Appellee, National Union Fire Insurance Company of Pittsburgh, Pennsylvania.
Bruce D. Beach, Nora M. Stelly, Allen & Gooch, Lafayette, L.A, for Defendants/Appellees, Webstone Company, Inc., Goddard Industries, Inc., United States Fire Ins. Co., North Rivers Insurance Co.
Court composed of ULYSSES GENE THIBODEAUX, BILLIE COLOMBARO WOODARD, and GLENN B. GREMILLION, Judges.
WOODARD, Judge.
In this personal injury action, the Plaintiffs were vacationing at the Richard Cabins when a fire severely injured them. An uncapped valve on a propane gas line *789 caused the accident. The Defendant, EmpireGas (Empire), a propane gas dealer, had serviced the Cabins years before the fire. It was not the provider at the time of the fire. The jury found that it was not at fault for the Plaintiffs' injuries. Plaintiffs appeal, asserting that the jury's verdict was manifestly erroneous. We agree. Finding no reasonable basis for the jury's conclusion, we reverse its verdict.

* * * * *
In the summer of 1995, six young adults were vacationing at Richard Cabins in Holly Beach, Louisiana. In the early morning, a fire in their Cabin R-6 awoke them. Although they were ultimately able to escape the Cabin, all were seriously injured. Apparently, an uncapped valve on the gas line running into Cabin R-6 had become, at least, partially open, allowing propane gas to leak into the Cabin, igniting a fire. It is not clear how the valve was opened, but it is clear that there should have been a cap on it, which would have prevented an accidental leakage.
Mr. Lawrence Lanclos purchased the Richard Cabins in 1986. Since then, he had used two different gas distributors to service themFerrellGas and Empire. The record supports that he used Empire's services from the time he purchased the Richard Cabins until the end of 1987. Ferrellgas took over in May of 1989. The service, if any, provided to the Richard Cabins in the interim is unclear, but Ferrellgas was the servicing distributor for these cabins from May of 1989 until, and including, the time of the fire. Allegedly, neither Ferrellgas nor Empire fulfilled its duty to inspect the propane system, at least from the inside of the cabins, before providing initial service to Mr. Lanclos. The Plaintiffs allege that had either of these dealers conducted the required inspection, it would have detected uncapped valves, remedied the problem, and prevented the fire.
However, the evidence revealed that for some time after Mr. Lanclos purchased the cabins, there was a space heater attached to the gas line in Cabin R-6, obviating the need for a cap on the valve at the end of the line. In fact, the evidence supports an inference that the space heater was attached the entire time that Empire serviced the cabins. At some point after Empire's service, Mr. Lanclos removed the space heater, leaving the valve unprotected, creating the dangerous configuration which ultimately led to the fire.
Accordingly, Plaintiff, Angela Thibodeaux and family members, filed suit in the 38th JDC for Cameron Parish, as did the other five victims, William John (Billy) Britt, Michael Bonin, John Perez, Brent M. Benoit, and Jeffrey W. Kebodeaux, and their family members, for injuries resulting from the fire. Unfortunately, Mr. Bonin and Mr. Benoit are now deceased due to events unrelated to this incident. Mr. Bonin died before trial began and Mr. Benoit has died since trial, while this appeal was pending. The Plaintiffs named as Defendants, Mr. Lanclos, Ferrellgas and its insurers, and Ferrellgas' employee, Paul Deshotel. Mr. Britt had medical insurance with Continental Insurance Company (Continental) through his employer, Wright Enrichment. Wright Enrichment and its insurer, Continental, intervened to recoup medical benefits they paid on Mr. Britt's behalf.
Just before trial, Ferrellgas and its agents, employees, and insurers settled with the Plaintiffs under a "Mary Carter agreement." In this type of an agreement, a defendant settles with a plaintiff but remains a party to the suit and retains a financial interest in any recovery the plaintiff *790 obtains from the other defendants.[1] In this particular agreement, Ferrellgas settled with the Plaintiffs for eighteen million dollars; however, it remained a party in the action, essentially, aligning itself with the Plaintiffs. The latter added, as Defendants, Empire and its insurers, as well as Webstone Inc./ Goddard Industries, the alleged manufacturer of the valve, and its insurers. The cases were consolidated. Empire and its insurers filed third-party demands against Mr. Lanclos, Ferrellgas, and its employee, Paul Deshotel.
The trial court dismissed Webstone-Goddard and its insurers on summary judgment, which was not immediately appealable. However, subsequently, the trial court granted summary judgment to Empire and its insurers. At that time, the judgment in favor of Webstone-Goddard became appealable. However, the Plaintiffs appealed, only, the judgment in Empire's favor. On appeal, this court found the summary judgment to be premature. We reversed and remanded for a jury trial against Empire.[2] Consequently, the trial was set for September 11, 2000 in Cameron Parish. However, the week before trial, one of the Plaintiffs' attorneys began running a public service announcement on the local television station. The court found that the particular announcement would likely prejudice a jury against Empire. Thus, it ordered that venue be transferred to Rapides Parish, which was not within the television station's viewing area. This court reversed the transfer order. However, the supreme court reinstated it.[3] Accordingly, the consolidated cases were transferred to the 9th JDC for Rapides Parish.
A jury in Rapides Parish heard the case. Mr. Lanclos was dismissed on a motion for directed verdict, leaving only Empire. The Plaintiffs argued that Empire breached its duty to inspect the facilities before initially servicing them, as well as, other duties imposed by the Louisiana Liquefied Petroleum Gas Commission (LLPGC) rules and regulations. Nonetheless, the jury returned a verdict of no fault on Empire's part. Plaintiffs filed motions for JNOV. These were denied. The Plaintiffs, along with Ferrellgas and Continental, appeal these decisions. Plaintiffs also appealed the 38th Judicial District Court's (JDC) summary judgment in favor of Webstone-Goddard and its insurers. However, at this point, since the appeal was untimely, Webstone-Goddard filed a motion to dismiss it. Plaintiffs do not argue this issue in its brief, conceding that this appeal was not timely filed; thus, the motion to dismiss it should have been granted. Accordingly, we grant Webstone-Goddard's motion to dismiss the appeal against it[4] and turn to the appeal of the jury's verdict in Empire's favor.
The Plaintiffs and Intervenors appeal the jury verdict, alleging that: 1) the jury failed to consider or accord sufficient weight to Empire's violation of various Louisiana Liquefied Petroleum Gas Commission (LLPGC) rules and regulations; 2) the jury failed to properly consider and/or accord proper weight to the testimony of Mr. Courville, a former retail manager for Empire; 3) the jury failed to consider *791 Louisiana jurisprudence concerning the heightened duty which distributors of propane gas owe; 4) the jury failed to consider all the evidence when considering Empire Gas's fault; and 5) this matter was improperly submitted to the jury in violation of Local Rule XII(E) for the 19th Judicial District Court due to the Defendants having failed to timely pay a jury bond.
We must determine whether it was proper for the jury to hear this case and, if so, whether its conclusion that Empire has no liability to the Plaintiffs was a reasonable one.
LOCAL RULE XII(E)
Local Rule XII(E) of the 9th JDC requires a party, requesting a civil jury trial, to deposit a $1,200.00 cash bond, thirty days before the trial starts; if the party does not timely make the deposit, it shall not be entitled to a jury. In the instant case, the Defendants did not deposit the $1,200.00 cash bond thirty days before trial. However, the Cameron Parish Court in the 38th JDC originally set the bond before the case was transferred. A jury bond was posted in that court, but Ferrellgas argues that the amount of the deposit was insufficient, even at that time. Thus, it urges us to disregard the jury's verdict and, either, review the case de novo or remand it for a bench trial based on the violation of Local Rule XII(E). After reviewing the record, we decline to do this, finding that the trial judge for the 9th JDC gave it proper consideration and did not abuse his discretion in honoring the 38th JDC's ruling instead.
La.Code Civ.P. arts. 1733 and 1734 govern issues involving jury bonds. Article 1733 provides that a party may obtain a jury trial by demanding one and by filing "a bond in the amount and within the time set by the court pursuant to Article 1734." Article 1734 requires the court to "fix the amount of the bond to cover all costs related to the trial by jury" and to set a time for filing the bond no later than thirty days before trial. In the instant case, the 38th JDC responded to both Plaintiffs' and Defendants' requests for a jury trial with an order setting the jury bond at $2,500.00. Defendants posted a $250.00 bond in response to this order. Plaintiffs provided security and agreed to pay costs as they accrued up to $2,500; however, they assert that this was not in response to the order to secure a jury trial. Both bonds were posted more than thirty days before trial. Thus, the 38th JDC either found that Defendant's bond was acceptable or accepted Plaintiffs' security.
We find that if the 38th JDC found that the jury trial was secured in accordance with the Plaintiffs' demand, their oral objection at trial was insufficient to withdraw the demand, as a written withdrawal is required.[5] Alternatively, if the jury trial was secured in accordance with the Defendants' demand, the 38th JDC found the $250.00 bond to be sufficient. Plaintiffs did not present the argument that the Defendants' bond was insufficient to the 38th JDC, even as the prospective jurors were being questioned on the first day of trial.
Regardless, the 9th JDC made it very clear that, whatever the reason, the 38th JDC had been satisfied with the security and it would honor the 38th JDC's ruling. The 9th JDC stated:
Understand I want this to be very clear. Whether it was Two Hundred and Fifty Dollars or Twenty-five Hundred Dollars, at the time of the filing of this suit, pursuant to an order by another trial court judge, a bond was posted. It is *792 not fair for me to go andand try to understand why it may have just been Two Fifty or Twenty-five Hundred Dollars. The truth of the matter is, apparently he [the 38th JDC] was satisfied with what was posted. The case was transferred to me from Cameron Parish, and I'll honor that rule from that parish, and we'll proceed from there.
We find that it was, indeed, within the 9th JDC's discretion to honor the 38th JDC's rule. "[L]ocal rules of court are intended solely to aid in the orderly conduct of litigation[.]"[6] "Moreover, the trial court has great discretion in the construction, interpretation, application or enforcement of its own rules."[7] (Emphasis added.) "Rules of procedure are to be construed liberally with due regard for the fact that such rules implement the substantive laws and are not an end in themselves."[8]
Further, while there are jurisprudential rules that govern which court's laws apply when there is a conflict created by a change of venue, there are no such rules governing a court's rules of administration.[9] The transferee court has discretion to apply the transferor court's rules of administration, if it promotes judicial efficiency in its own courtroom. Normally, the rule is stated in terms that allows the transferee court to apply its own rules, rather than those of the transferor court's, because this will usually be the most efficient for the transferee court.[10] However, the decision is a discretionary one, and its primary purpose is to promote judicial efficiency in the transferee court. Thus, we find that the transferee court may, instead, apply the rules of the transferor court when it would better serve the purpose of promoting judicial efficiency in the transferee court.
Thus, while the 9th JDC, as the transferee court, was not mandated to apply any of the 38th JDC, transferor court's administrative rules, we find that the 9th JDC did have discretion to recognize and uphold any of its procedural rulings in the interest of judicial efficiency, since that is the primary purpose of promulgating local court rules.[11]
An appellate court must review a district court's application of its own local rule, only, for manifest error or an abuse of discretion, as district judges are more adept at interpreting their own rules.[12] We see no reason why a district court judge should not extend the same deference to another district court judge. The trial court did exactly that and found that because of the unusual nature of the case being transferred at such a late stage of the proceedings, it would honor the transferring trial court's actions, as that court's rules applied at the time the jury trial request was made when the bonds were *793 set to secure such trial, as well as when the bonds were posted.
Additionally, we note that La.R.S. 13:3273 requires that the party, who requests transfer of venue, "pay to the clerk of the court where the action is transferred all of the fees to which this clerk would have been entitled had the action been instituted initially, and all of the proceedings, had in this court." Notwithstanding, the Plaintiffs did not request the proper relief according to this article, which provides that the sanction on the requesting party for not advancing such costs is that the transfer will not be granted but, instead, the case should proceed in the court from which it was transferred. Moreover, as soon as Empire learned of a potential problem with the jury bond, it immediately posted a sufficient bond in the 9th JDC, remedying the problem.
Accordingly, we find no manifest error in the trial court's decision. Therefore, we continue with a review of the jury's determination.
DUTY/RISK ANALYSIS
Jurisprudence dictates that we use the duty-risk analysis to determine whether recovery is permitted under the statute which obligates each person to repair damage that s/he causes.[13] This includes a determination of whether: 1) the defendant's conduct was a cause-in-fact of the resulting harm; 2) the defendant owed a duty to the plaintiff; 3) the duty was breached; 4) that duty encompassed the particular risk and harm which the particular plaintiff suffered; and 5) the plaintiff suffered actual damages.[14]
In order for Plaintiffs to recover damages from Empire, the jury must have answered all five of these questions affirmatively.[15] We must review its determination under the manifest error standard. As such, in order to reverse the trial court's judgment, after reviewing the record in its entirety, we must find that a reasonable factual basis does not exist for the jury's finding and that the record establishes that the finding is clearly wrong.[16]
DUTY
"Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory or jurisprudentialto support his claim."[17] There is no question that Louisiana jurisprudence imposes a heightened duty on those involved in the manufacture, preparation, and distribution of propane gas, recognizing that they must exercise more than an ordinary degree of care.[18] The jury was instructed of the heightened duty imposed on Empire:
[T]he following standards apply: (1) The dangerous nature and hazardous character of liquefied petroleum gases has been recognized by the constitution and laws of this State and provision has been made for the regulation of its use in the interest of public safety; (2) Moreover, the jurisprudence of the State has recognized the greater and higher than ordinary degree of care demanded of those involved in the manufacture, preparation *794 and distribution of propane-butane gas and similar products.
(Emphasis added.)
Furthermore, this court has held[19] and the jury was charged that:
An original tortfeasor will not be relieved of the consequences of its negligence, unless the intervening cause superseded the original negligence and, alone, produced the injury. If the original tortfeasor could or should have reasonably foreseen the incident that might occur, he will be liable notwithstanding the intervening or superseding cause.
Obviously, there is a strong public policy consideration imbedded within these caveats; namely, those who distribute gas are in a superior position to that of consumers and, therefore, are charged with a duty to protect consumers' safety in this regard.
To determine whether Empire had a role in causing this fire, it would like us to focus solely on Cabin R-6's condition at the time of its service period; urging that, because there was no indication of a problem in that cabin, it could not be held responsible for the fire in that cabin, occurring while it was no longer servicing the account. However, we note that the rules and regulations which govern all gas distributers focus on the system, not a single component of the system. In other words, the system as a whole must pass the safety test; otherwise, the gas distributer is forbidden to provide any service at all to the account. Given this mandate, we will focus on the condition of the system during Empire's service period, the scope of its duty, and whether there was a superceding and intervening cause which, alone, caused the fire.
BREACH/LLPGC VIOLATIONS
In the interest of public safety, the Louisiana Department of Public Safety and Corrections Liquefied Petroleum Gas Commission promulgates rules and regulations which govern the storage, sale, and transportation of liquefied petroleum gases, the installation of tanks or systems, and the installation and use of liquefied petroleum gas appliances. The Plaintiffs claim that Empire violated these rules which, ultimately, contributed to the fire and, consequently, to their injuries.
The jury was instructed of the following LLPGC rule:
A dealer shall not serve any liquefied petroleum gas system which the dealer knows or should know is not installed pursuant to the Liquefied Petroleum Gas Commission Regulations or is in a dangerous condition. All new installations or reinstallations must be checked by the dealer for tightness of lines, poor workmanship, use of unapproved pipe or appliances or use of poor piping design. All improper installation shall be corrected before the dealer services such installation or reinstallation with fuel for the first time. Any subsequent servicing dealer shall not be responsible for unauthorized changes in or failures of an existing system or connected appliances.
Given jurisprudence and other rules to follow, we believe the last sentence applies to unauthorized changes between service periods; however, a dealer must check the system each time before servicing the account, at which time, it should detect and correct any improper changes.
The jury was also instructed of the following rules that specifically delineate certain *795 requirements for finding the system to be in a safe condition:
Piping, Tubing and Fittings, Paragraph (a) Piping Material: Piping shall be wrought iron or steel (black or galvanized), brass or copper pipe or seamless copper, brass or steel.
....
Cap Outlets: Each outlet, including a valve or cock outlet shall be securely closed gas-tight with a positive threaded plug or a cap if appliance is not to be connected. When an appliance is removed from an outlet, and the outlet is not to be reconnected at that time, it shall be securely closed gas-tight. In no case shall the outlet be closed with tin caps, wooden plugs, corks, etcetera.
(Emphasis added).
The record reveals that the system contained numerous unauthorized piping from the time Empire began servicing it until the time of the fire. Additionally, Mr. Lanclos testified that there were uncapped valves in some of the cabins from the time he purchased them until after the fire. He also testified that no one from Empire ever inspected the inside of the cabins nor did they ask him any questions about the piping or appliances or any other aspect of the system before beginning service to him. Empire made no effort to refute this. Thus, there is no reasonable basis for the jury to have found that Empire did not breach its duty to inspect the system before servicing it.
The jury was further instructed:
[T]he violation of a Regulation of the Louisiana Liquefied Petroleum Gas Commission is negligence per se or negligence as a matter of law, and the negligence creates liability on Empire and/or Ferrellgas, the propane gas dealers made defendants herein, if such negligence was a legal cause of plaintiffs' burns.
....
But in exceptional circumstances, even a violation of the statute may be reasonable.
(Emphasis added.)
We are mindful that breach of duty is a question of fact and, therefore, subject to the manifest error standard of appellate review.[20] Accordingly, reasonable evaluations of fact should not be disturbed where there is a conflict in testimony.[21] However, in the case at bar, there is no conflict in testimony. Thus, the jury was not presented with two permissible views of the evidence from which to choose. Mr. Lanclos' testimony that Empire breached its duty to inspect his system before initially servicing it is unrefuted. Again, Empire presented no evidence whatsoever, nor did it even assert, that it did not breach its duty. Accordingly, there were not, even, allegations of any exceptional circumstances in the instant case that would have made Empire's violation of the LLPGC rule a reasonable one, absolving it of its negligence per se for its failure to inspect the system and correct safety hazards before servicing the account.
SCOPE OF DUTYLEGAL CAUSE
We must now address whether the risk of the Plaintiffs' injuries were within the contemplation of Empire's duty. "[T]he scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of *796 the duty."[22] We must examine how easily we can associate the Plaintiffs' injuries with Empire's conduct.[23]
"All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes."[24] The statutory predicate for establishing the LLPGC rule states that the rules and regulations shall be created for the purpose of protecting the public interest.[25] One of the rules of which the jury was informed is specifically designed to make sure that the customer is educated as to the dangerousness of the systems and of the need to have the entire system checked, periodically. The rule states:
Each dealer shall transmit a notice once each year to each customer stating that liquified petroleum gas systems are potentially dangerous, that a leak in the system could result in a fire or explosion, and that systems should be checked periodically.

(Emphasis added.) Thus, impliedly, Empire had a duty to educate its consumers of the various dangers associated with its product in order to prevent fire and injuries. Requiring a dealer to provide these written warnings is only one method necessary to accomplish this goal. We find that the LLPGC rules were unquestionably designed to encompass protection against the particular risk of harm in the instant case. Since the particular harm is embodied, we must inquire whether the rules extend to protect these particular plaintiffs.
Empire knew that it was servicing a vacation rental facility. Accordingly, it was entirely foreseeable that its failure to inspect the system, containing potential dangers for fire, could endanger unsuspecting people renting the cabins under its protection. The ultimate question is whether Empire's duty should extend to those who rented the cabins after it had ceased servicing them. "Where the rule of law upon which a plaintiff relies for imposing a duty is based upon a statute, the court attempts to interpret legislative intent as to the risk contemplated by the legal duty, which is often a resort to the court's own judgment of the scope of protection intended by the Legislature."[26]
The LLPGC rules and regulations applying to the instant case were adopted because of the extremely dangerous nature of the liquefied petroleum gas. They were framed based on a statute.[27] Neither the mere passage of time nor a joining tortfeasor is enough to absolve Empire of liability.[28] Thus, we believe that it would be against public policy to relieve Empire of the consequences of its negligence simply because a subsequent dealer was also negligent. Thus, if Empire's conduct was a cause-in-fact of the fire, as a matter of policy, we must not limit its liability.
*797 CAUSE-IN-FACT
Cause-in-fact is one of the essential elements of Plaintiffs' claim.[29] It is usually determined by using a "but for" test. In other words, if the plaintiff would not have been injured "but for" the defendant's conduct, the cause-in-fact component of the duty/risk analysis is met.[30]
However, when there is more than one action that allegedly precipitated an accident, our courts have fashioned a method that is more effective than the "but for" test in establishing cause-in-fact.[31] This method is often referred to as the "substantial factor test."[32] This is the proper test in the instant case because more than one party's conduct allegedly caused the fire; namely, the conduct of Ferrellgas, Empire, and Mr. Lanclos were the potential causes.
We determine whether Empire's conduct was a substantial factor in producing the fire in Cabin R-6 by examining the importance of the role its conduct played in producing the fire[33] and by inquiring whether its conduct set in motion a chain reaction which was continuous and actively operating until the time of the fire.[34]
However, even if we find the latter to be the case, Empire may be excused from liability for its negligence if an "intervening cause superseded the original negligence and, alone, produced the injury."[35] Mr. Lanclos' alleged knowledge that the valve in R-6 needed to be capped could constitute such a cause. In other words, if he already knew of the danger of uncapped valves, yet failed to cap the valve in Cabin R-6, Empire's inactions could not have contributed to the fire. Therefore, the entire cause-in-fact inquiry turns on Mr. Lanclos' knowledge of whether he needed to cap the valves.
Plaintiffs claim that he did not have this knowledge before the fire and argue that if Empire had inspected the Cabins when it began service, its inspection would have revealed uncapped valves in some of the other cabins which presented the same danger, as the valve in Cabin R-6 presented, which caused the fire once Mr. Lanclos removed the heater. Furthermore, had Empire informed him of the danger of those uncapped valves before servicing the would have had the knowledge to cap the valve in Cabin R-6, when he disconnected the heater, and would have done so, preventing the fire.
Concerning the existence of this dangerous configuration in some of the cabins during Empire's service period, Mr. Lanclos testified:
Q. When you bought the Richard Cabins in July of 1985[sic], did some of them have no cap on the gas valve?
A. Some of them didn't have no caps.
Q. All right. And did it stay like that until the fire?
A. They stayed like that until the fire.
Mr. Courville corroborated this testimony. Empire did not refute it. Instead, its defense rested on two other allegations why its substandard conduct/negligence per se was not a cause-in-fact of the Plaintiffs' *798 injuries; namely, 1) the dangerous configuration in Cabin R-6 did not exist during its term of service and 2) Mr. Lanclos already knew of the dangerousness of leaving a valve uncapped.
We do not find it reasonable to accept the argument that its failure to inspect the cabins was not a substantial factor contributing to this fire, simply, because the fire happened to occur in R-6 instead of one of the other cabins which displayed an uncapped valve at the time that it should have conducted its inspection. The LLPGC rules and regulations imposed a duty on Empire concerning the entire system; namely, ten cabins which where were all connected to and serviced by one tank. Mr. Lanclos testified that uncapped valves existed in some of the other cabins from the time he purchased them until after the fire. Therefore, if Empire had fulfilled its duty, it would have found the uncapped valves and should have informed Mr. Lanclos of these defects and danger, refusing to service the system until he corrected the defects by capping the valves.
Empire also attempted to prove that Mr. Lanclos already knew that an uncapped valve was dangerous, thus, urging that its failure to inform him of the danger was not a factor contributing to the fire because he was already aware of it. In other words, his lack of knowledge of the danger did not contribute to the cause of the fire. Therefore, its failure to inspect and inform him was not a cause-in-fact of the fire, absolving it of liability.
Mr. Lanclos repeatedly testified that he did not know before the fire that he needed to cap the valves which did not have appliances connected to them. Thus, the burden of proof shifted to Empire to prove otherwise, which it tried to do with the following testimony that he had given in an earlier deposition, which was not itself offered into evidence, regarding his removal of a gas appliance at his mother's house:
Q. Okay. Do you remember askme asking you these questions, and you giving this answer?
"Q. What did you just tell me about the plug, Mr. Lanclos?
A. You can't leave an open line. The gas is going to leak.
Q. And you knew that?
A. Yes.
Q. So you put a plug on it. Is that right?
A. Yeah."
However, Empire did not establish that the configuration at his mother's house was the same as that in Cabin R-6. Namely, it is apparent that Mr. Lanclos knew that an open line was dangerous, but did not know what role a cap versus a plug versus a valve plays in securing an open line. In fact, it is obvious from his following testimony that he thinks that if a line has a valve on it, it does not need a plug or a cap in order for it to be closed, as the LLPGC rules require; "Cap Outlets: Each outlet, including a valve or cock outlet shall be securely closed gas-tight with a positive threaded plug or a cap if appliance is not to be connected." Mr. Lanclos testified:
Q. And when youwhen you took your motherthe heater out of your mother's house, you put a cap on that gas line, didn't you?
A. No, I didn't put no cap on it.
Q. You didn't?
A. No.
Q. Okay, the gas line was just opened?
A. No, it had aa valve on it.
And:
Q. Okay. Do you remember testifying that there was a gas line coming out of the floor at your mother's house?

*799 A. Yeah.
Q. And did Ididwere you asked this question, at page 40 line 8, "Did it have a valve on it?" And do you remember giving the answer, "I don't think so." Do you remember
A. Maybe I said it, but Iyou can't have a line without no something on it. It would have burned the house.
Q. Uh-huh. And whatit didn't have a valve on it, so you put a cap on it. Isn't that the truth?
A. A valve on it. You know, a valve. Something you can open and close.

(Emphasis added.)
This testimony simply demonstrates that Mr. Lanclos knew that an "open line" was dangerous and believed that a valve was sufficient to close it and, thus, prevent a leak. However, Empire failed to show that he knew that a valve had to be capped or plugged.
Uncontradicted testimony must be accepted as true, as a matter of law, absent "sufficient evidence to cast serious doubt or suspicion" over its reliability.[36] Mr. Lanclos' testimony regarding his knowledge before the fire is uncontroverted. Given the record as a whole, we find this testimony to be inconclusive as proof of Empire's defense and, therefore, unreasonable for the jury to have used it in impliedly finding that Empire's failure to inspect and inform was not a cause-in-fact of the fire.
Accordingly, Empire' substandard conduct of failing to perform its duties to inspect the system and inform Mr. Lanclos set in motion a chain reaction that contributed to the cause, and actively operated until the time, of the fire.
Therefore, we find that the jury's finding of no liability on Empire's part for injuries these Plaintiffs suffered was unreasonable. Recognizing that the duty-risk analysis involves determinations to which we owe great deference to the trier of fact, we must also recognize our constitutional duty to review the facts as well as the law.[37] In doing so in the instant case, we cannot discern a reasonable basis upon which the jury could have reached the conclusion that Empire was relieved of all liability for the injuries Plaintiffs' sustained. Therefore, we reverse the trial court's judgment and turn to the issue of apportioning fault.
ALLOCATION OF FAULT
We will not consider fault on Mr. Lanclos' part since he was dismissed on a directed verdict and the issue of his fault did not go to the jury.
In allocating fault, de novo, between Empire and Ferrellgas, our supreme court instructs us, in Watson v. State Farm Fire and Casualty Insurance Company, that we must examine the nature of each's conduct, as well as the extent of the causal relation between that conduct and the Plaintiffs' damages.[38] In assessing the nature of the conduct of the parties, Watson delineates various factors which may influence the degree of fault assigned, including:[39]
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger,

*800 (2) how great a risk was created by the conduct,
(3) the significance of what was sought by the conduct,
(4) the capacities of the actor, whether superior or inferior, and
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
We find that, under four of these factors, Empire and Ferrellgas bear equal responsibility for the Plaintiffs' damages. Namely, there is no distinction between either's capacity as an actor. In other words, neither was acting in a capacity that was superior to the other, as both were acting in the capacity of liquefied petroleum gas distributors and, thus, were charged with the same duties and standard of care. Each breached the same duty and, therefore, created the same risk. And, presumably, both were seeking the same advantage by not inspecting the system, which was simply to save time and, in turn, money.
We recognize, however, that there was more than one event during Ferrellgas' term of service that triggered a duty for it to inspect Mr. Lanclos' system. Further, Empire provided service to the Cabins for less than two years, while Ferrellgas provided service for more than six years. Significantly, the latter was the provider at the time of the fire. These factors are relevant to determining the extent of the causal relationship, which encompasses concepts such as last clear chance. Thus, although we find that Empire's substandard conduct played an important role in the fire, Ferrellgas must bear the greater portion of responsibility. Ferrellgas had the last clear chance to prevent the fire as well as the opportunity to inform Mr. Lanclos of the need to cap the valve in Cabin R-6, specifically. Accordingly, we assess Ferrellgas with sixty-five percent of the fault and Empire with thirty-five percent.
DAMAGES
Because of the jury's decision that Empire was not at fault, it did not address the issue of damages. We proceed, then, to address this issue since we have a complete record from which to calculate damages.[40] Normally, we review a quantum of damages for an abuse of discretion and if we find such an abuse, we are confined to awarding the lowest amount that the jury could have reasonably awarded when the award is insufficient and the highest amount where the jury has awarded an excessive amount.[41] However, since the jury did not award any damages in the instant case because it found a causal connection lacking, we are not bound by these restrictions.[42]
The parties stipulated to the amount of past medical expenses. Thus, we must determine the amount of general damages that each Plaintiff sustained. General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty.[43] *801 They "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms."[44] In the instant case, we believe that these damages encompass: 1) physical and mental pain and sufferingpast, present, and future; 2) permanent scarring and disfigurement; and 3) loss of enjoyment of life. Additionally, we must determine two items of special damages; namely, future medical expenses and loss of earning capacity.
GENERAL DAMAGES
Physical and mental pain and suffering-past, present, and future
The primary factors in assessing this element of damages are the severity and the duration of the pain and suffering.[45]
Plaintiff, Angela Thibodeaux, recounted the incident in the following testimony:
A. Everybody was screaming.
Q. And could you see Jeff?
A. No
Q. Why not?
A. I don't know. I justthere was this red glow in the room, you know. I could see people, but I mean it was like I could seewhat I could see was skin floating in the air, you know. There was just skin everywhere.
Q. Whose skin?
A. Ours.
....
A. I got up from the bed, and I stepped on the mattress that was in the middle and burned my feet real bad. So I fell back on the bed, and I was rolling around, and all my skin was hanging.
Q. from your arms?
A. From fingertips. I could just feel the skin just melting off my face....And all the skin from the bottom of my feet just melted to the top of my feet, like, you know, melt plastic. It just all was on top of my feet.
Q. Did you fall?
A. Yeah.
Q. How many times did you fall?
A. I just kept slipping.
Q. So you could hear people, that there were still people inside the cabin, screaming for help?
A. Yeah. I could hear Mike ... He was screaming, "Just kill me. Just kill me, please."
All the Plaintiffs gave similarly disturbing testimony, except for Mr. Bonin and Mr. Perez, who have no recollection, at all, of the incident, itself. The Plaintiffs also testified that after s/he escaped the Cabin, s/he did not know which friends, if any, were still inside. Ms. Thibodeaux testified that she could hear her fiance, Mike, screaming and that she watched Mr. Britt go back into the flaming cabin at least twice to rescue their friends.
Even after the paramedics secured the Plaintiffs in ambulances, they could not give the patients any relief from the pain because the burns prevented them from being able to find any veins. This court cannot imagine, and we find no comparable cases like, the terror in Cabin R-6 on August 12, 1995, as the Plaintiffs described *802 it. And yet, we must attach a monetary value to the fear and anguish, terror, that these young adults experienced.
All of the Plaintiffs suffered serious burns in this fire. While the total burned body surface varied from thirty percent to sixty-five percent, much of the treatment each of them received consisted of the same procedures. For example, the Plaintiffs, as well as their physicians, attested to the incredible pain of debridementa procedure that each Plaintiff had to endure at least once a day, each day, that they remained in the Burn Unit. There was testimony that debridement involves rubbing the skin with rags with enough pressure to remove the dead skin. It must be done daily to prevent infections. Additionally, all of the Plaintiffs had multiple skin grafts; that is, skin was taken from parts of the body which were not burned and placed on the burned area. And, the Plaintiffs and physicians agreed that the donor sites (from which the skin is removed) can generate as much or more pain than the actual burn sites. In fact, more than one of these Plaintiffs testified that the time spent in the hospital was worse than the actual fire.
Additionally, for about two years after their release, they were required to wear Jobst suits. These are elastic garments that had to put enough pressure on scars to flatten them, as they mature, and help to minimize hypertrophic scars or skin thickening. And, as with all burn patients, these will always have trouble tolerating the heat and humidity because there are no sweat glands in the skin which has been grafted onto the burn areas. Further, the grafted skin will always be more readily irritated, torn, and cut, etc. Family members testified that these young people were more withdrawn because of their injuries, as well.
Specifically, Angela Thibodeaux suffered burns to 30-35 percent of her total body surface. She spent three weeks in the burn unit. She had surgeries on her right hand to regain its functionality. At the time of trial, she still could not bend one of her fingers and complained of arthritis in that hand. She also was having trouble bending her right knee because of the tightness of the grafted skin. Ms. Thibodeaux testified that she continued to have nightmares and had trouble sleeping for fear that she would wake up on fire, again. She also stated that she still had flashbacks when she was awake. Additionally, she sustained an orthopaedic injury to her knee when the melted skin on her feet caused her to fall in the parking lot once she escaped the cabin.
Brent Benoit suffered burns to approximately 42 percent of his total body surface, including his face, neck, chest, abdomen, back, both arms, forearms, and hands. He, also, spent three weeks in the burn unit. He had multiple skin grafts. He testified that he had nightmares of the event for over a year afterwards and that he was still having flashbacks at the time of trial.
Billy Britt suffered burns to 50-55 percent of his total body surface. Initially, he had to be placed on a respirator. He was released from the burn center after six weeks. While there, he required consultation and treatment from Dr. Reed, the pain management specialist. He was left with severe disfiguration of the upper lip, the loss of open nostrils, and a tightness or contracture involving his mouth. He also had contracture of the right elbow, preventing him from extending his arm very far. Mr. Britt continuously needed treatment and surgery to allow him to open his mouth. At the time of trial, his mouth had begun contracting again. Eventually, he will need another surgery *803 for this, as well as for his right thumb and wrist. He has complaints of aching in his upper extremities whenever he attempts any strenuous activities. One of his physicians explained that this was because the grafted skin was tighter than normal skin; therefore, when his muscles swell from activity, the skin does not stretch to accommodate this. There is no way to alleviate this problem.
Jeffrey Kebodeaux was assessed with 60 percent total body surface burns. He spent forty-seven days in the burn unit. He had several skin grafts. His most severe burns were to his lower legs, feet, and ankles. One physician testified that Mr. Kebodeaux's skin was likely to break down in the future because of these particular areas which he had to have grafted. In a follow-up visit four years after the accident, that same physician noted that "[t]his simple action of putting his hands in and out of his pants [pockets] was actually wearing that skin out."
Michael Bonin suffered from burns to 60-65 percent of his total body surface, as well as respiratory burns. He was in the burn unit for two months. He had to have a tracheotomy for the inhalation injury. He also had to have numerous blood transfusions. He lost the tips of some of his fingers and lost part of his nostrils and the tip of his nose. Accordingly, he had multiple surgeries on his hands and face. Once skin was used to replace the nostrils, it was too thick, and he had problems with the his nostrils closing up.
John Perez suffered from burns to 50 percent of the total surface area of his body. He was not released from the burn unit for three months. He had to be put on a respirator when he was admitted. He had several skin grafting surgeries and required several units of blood. Unfortunately, his left arm was completely charred. He developed gangrene in his arm. In fact, his doctors had to amputate it to prevent the spread of infection.
Permanent Scarring and Disfigurement
This court has previously borrowed the definition of disfigurement from other jurisdictions. "The term ... has been defined... as `that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner.' "[46] The photographs in the record telegraph these Plaintiffs' severe burn injuries and resulting scars which, obviously, have dramatically affected their appearance.
Mr. Britt and Mr. Perez suffered the most permanently disfiguring injuries. However, a review of the physicians' testimonies reveal that all of the Plaintiffs in the instant case will have permanent scarring in roughly the same proportion to the surface area that was burned. Further, each Plaintiff suffered burns and scarring on some part of his or her face, which will always be exposed and visible to the public.
Loss of Enjoyment of Life
Loss of enjoyment of life is separate and distinct from physical and mental pain and suffering. It includes evaluations regarding how the plaintiff's lifestyle has been altered due to the injuries and what kinds of social and/or recreational activities s/he has been forced to give up.[47]
*804 Essentially, there was similar testimony from each Plaintiff in the present case on this issue. All of these Plaintiffs enjoyed outdoor activities before the fire. Even though their injuries do not prevent them from physically continuing these activities, such as boating and fishing, they are limited in their enjoyment of these activities during the daytime by their inabilities to withstand heat and humidity and the increased danger of their being exposed to the sun.
Thus, we award each Plaintiff the following awards of general damages based on his or her specific injuries:

Angela Thibodeaux $2,000,000.00
Brent Benoit $2,250,000.00
Jeffrey Kebodeaux $2,500,000.00
Michael Bonin $1,750,000.00
John Perez $3,000,000.00
Billy Britt $3,000,000.00

SPECIAL DAMAGES
Past Medical Expenses
The parties stipulated to the amount of past medical expenses that the Plaintiffs incurred, which included their immediate treatment, as well as the surgeries each Plaintiff had until the time of trial.
Future Medical Expenses
The Plaintiffs' burden is to establish the necessity of future treatment to a reasonable degree of certainty, along with the probable cost for that treatment.[48] In other words, the plaintiffs must show that, more probably than not, these expenses will be incurred.[49] In the instant case, the Plaintiffs submitted projections of future medical costs based on the Life Care Plans which Mr. Hebert, a Vocational Expert and Certified Life Care Planner, created. Empire's rebuttal to these projections consisted of pointing to certain recommendations within the plans which the Plaintiffs had not pursued from the time the plans were developed until the time of trial. We accept Mr. Hebert's explanation for this concerning certain recommendations which he had not yet discussed with the Plaintiffs. For instance, he did not outline the future surgeries that were recommended over the course of the rest of their lives, explaining, "[w]e don't tell them that, because we don't want them depressed[.]"
However, we do find that the Plaintiffs' failure to pursue certain therapies that Dr. Lecorgne has continuously recommended to them since 1996 supports a finding that they are not likely to incur these expenses in the future. In the current life care plans, certain services were scheduled to begin the month after trial. The same services were recommended in the previous life care plans in 2000 and scheduled at that time to begin immediately. Further, Mr. Hebert testified that Dr. Lecorgne recommended the same services in the very first life care plan in 1996.
Namely, Dr. Lecorgne recommended for each Plaintiff: 1) an in-patient evaluation, costing $350.00-$500.00; 2) an in-patient program lasting 90-120 days for $550-$750 per day; 3) Bio-feedback, beginning once a week and slowly tapering to four times a year for life for $110.00-$125.00 per visit; 4) Group Counseling, beginning once a week and slowly decreasing the frequency to four times a year for life at a cost of $110.00-$125.00 per visit; 5) Family Counseling, beginning once a month and tapering to four times a year for life for $110.00-$125.00 per visit; and 6) Psychological Counseling, beginning once a week and decreasing the frequency to twice a *805 year for life, costing $110.00-$125.00 per visit.
Mr. Hebert admitted that the purpose of the in-patient evaluation is to tailor the treatment that follows to the individual's needs. Since the Plaintiffs have declined the in-patient evaluation since 1996, we find that the need for all but two of these additional services is too speculative. The Plaintiffs testified that they had previously engaged in group counseling, individual counseling, or both, although we do not know how often. The fact that they have previously sought this treatment supports that they will continue to incur the related expenses. Therefore, we accept Dr. Lecorgne's recommendations regarding the frequency, and we award the projected costs in the life care plan for these two services. Conversely, none of the Plaintiffs have engaged in formal family counseling or bio-feedback. Thus, we decline to award the costs of these services, as we cannot find that, more probably than not, they will actually incur them. Neither do we award the costs of the in-patient evaluation or the in-patient program. Again, none of the Plaintiffs have pursued these recommendations during the six years that Dr. Lecorgne has been recommending them. In fact, one of the Plaintiffs testified, "Well, he wanted to stick me in like a close to three, six or a year program." (Emphasis added.) Thus, the Plaintiffs have met their burden of proving that they will incur future medical expenses for only two of these six services.
Additionally, based on Mr. Hebert's own testimony, we find the projected costs for a "case manager" to be highly inflated. Each Plaintiff's plan recommends that s/he meet with a case manager once a month at a cost of $170.00-$250.00 per visit. Mr. Hebert was the case manager for the Plaintiffs, yet he did not meet with them on a monthly basis. Furthermore, he testified:
A. At that time, my role was to set up medical treatment for all six of the individuals, to see that the bills were going to be paid, and that all of the surgeries and whatever was needed would be scheduled.
Q. All right. And would you say that you've been the case manager for all of these people throughout thethe five or six years since the accident?
A. I did it for a while. And then, after a while, I kind of stepped back because they were seeing their own doctors. They were scheduling their own appointments. The bills were being paid properly. So I just kind of just monitored the files.
Accordingly, we do not find that Plaintiffs are likely to incur the expenses of meeting with a case manager every month. Mr. Hebert obviously felt that their need for his services as case manager dwindled over the six-year period. We find that two, not twelve, sessions per year will allow the case manager to adequately monitor their files.
The evidence supports that the Plaintiffs will incur the costs for lawn maintenance and housekeeping services projected in the plans. Thus, we include these expenses in the award of future damages.
The other items related to the Plaintiffs' future medical care involve medical supplies and equipment, check-ups with the plastic surgeon, and, mostly, future surgery. In all cases, either the Plaintiff's treating plastic surgeon or an independent plastic surgeon has corroborated these costs. Thus, we will defer to the surgeons' projections.
Loss of Earning Capacitypast and future
Except for Mr. Britt, none of the Plaintiffs were employed at the time of *806 the fire. However, if a person has the ability to earn a certain amount before his or her injury and, because of the injury, is left with the ability to earn, for example, only one-fourth of that amount, that person is entitled to recoup the other three-fourths in damages.[50] This element of damages is termed "loss of earning capacity."[51] Another label that is sometimes used is "impairment or diminution of earning power."[52] "The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity."[53]
The Plaintiffs submitted projections of loss of earning capacity, again, based on the calculations which Mr. Hebert made in the Life Care Plans and Dr. Douglas Womack, an economist, converted into present value. Mr. Hebert's testimony reflected that he considered the proper factors in assessing loss of earning capacity; namely, whether the injuries prohibit the Plaintiffs from work for which s/he is fitted by training and experience, age and life expectancy, previous earnings, work record, or education, the amount Plaintiffs, probably, would have earned absent the injury, and whether and for how long Plaintiffs' injuries will prevent him or her from engaging in work of the same or similar kind that s/he was doing or planning to do before the injury.[54]
Mr. Benoit was not working at the time of the fire because of a previous back injury. He graduated high school with average grades, then, started doing construction work. He also worked as a roustabout, and he had taken some vocational classes in electricity. Therefore, Mr. Hebert calculated his earning capacity before the fire at $425.00 per week based on an electrician or electrician's helper's salary. He felt that after about a year, Mr. Benoit would be capable of securing a job that paid between $5.15 and $6.00 per hour. Therefore, Mr. Benoit's loss of earning capacity before trial and for one year after trial was the entire $425.00 per week. Thereafter, the amount was offset by $220.00 per week. After taking into account Mr. Benoit's work life expectancy, Dr. Womack, converted these amounts into present value. Mr. Benoit's total loss of earning capacity is $427,241.00.
At the time of the fire, Mr. Britt was employed as a forklift operator at Wright Enrichment, making $6.00 an hour. He worked as a farmer with his dad when he was young. He had also worked at Capital Manufacturing, threading pipe. He never held a job where manual labor was not involved. However, he is a high school graduate, and he was only two tests shy of becoming certified as an electrician. Mr. Hebert calculated his earning capacity before the accident on the basis of what an electrician earns, which is around $12.00 per hour. However, he determined that because of ongoing medical treatment, future surgeries, cosmetic disability, decreased functionality of Mr. Britt's hands, *807 and psychological problems, he was totally and permanently disabled. Accordingly, he considered Mr. Britt's loss of earning capacity to be the entire $12.00 per hour for the duration of Mr. Britt's expected work life. Dr. Womack converted the loss into present value which is $770,587.00.
Before the fire, Ms. Thibodeaux had worked as a waitress and had taken some secretarial courses. She worked as a secretary for about two years. She did not graduate from high school but did get her G.E.D. Before the fire, Outback Steakhouse had hired her as a waitress, and she was supposed to start work the Monday after the fire. An Outback supervisor testified that her approximate salary would have been $4.25 per hour with projected tips of $40.00 to $50.00 per shift. He stated that the average employee works four shifts per week. Mr. Hebert found that, before the accident, she had the capacity to earn $350.00 per week; however, due to the accident, she was permanently and totally disabled for the rest of her expected working life because of her need for ongoing medical treatment and because she had not, yet, been able to accept her disability. Further, the injuries she suffered to her hands are extremely limiting as she cannot even bend her fingers in a position to write with a pen or pencil for any length of time, without experiencing tears to her skin. He assessed the present value of her total loss of earnings as $622,894.00.
Mr. Perez quit school in the eighth grade and was unable to pass the G.E.D. He worked with his grandfather, remodeling houses, for a while. Then, he got a job as a roustabout for about a year, making $8-$10.00 per hour. Mr. Hebert found that before the accident, he was limited to working as a laborer because of his intellectual ability. Therefore, he calculated Mr. Perez's earning capacity at $8.00 per hour at sixty hours per week. He testified that there was usually overtime involved in work as a laborer. Mr. Hebert calculated this loss for the duration of Mr. Perez's expected work life and felt that his intellectual ability prevented him from obtaining a sedentary position. Dr. Womack converted Mr. Hebert's findings to present value as $700,987.00. While we agree with Mr. Hebert that Mr. Perez can no longer work as a result of the injuries the accident caused him, we do not find that Mr. Perez' earning capacity before the accident was as high as Mr. Hebert estimated. Rather, we feel that Mr. Perez had the capacity to earn minimum wage, working forty hours per week. Accordingly, we award Mr. Perez $355,875.00 for the loss of his earning capacity.
Mr. Kebodeaux quit high school in the eleventh grade and worked as a roustabout for about two years. However, he was in an accident which paralyzed his right arm. Before the fire, he was working with a vocational technology counselor for the State of Louisiana to train for work as a security guard or counter clerk. Based on this, Mr. Hebert assessed his earning capacity before the accident at $5.50 per hour. Mr. Hebert felt that Mr. Kebodeaux had no capacity to earn after the fire because of his psychological state and because his burns caused his skin to itch all the time. Further, as the physicians testified, Mr. Kebodeaux's worst burns were to his feet and ankles, areas that are more likely to break down and tear easily. Accordingly, Mr. Kebodeaux is now limited by injuries to his lower extremities as well as by the previous injury to his arm. Dr. Womack's conversion resulted in a present value of $355,875.00.
Empire attempted to refute Mr. Hebert's determinations that four of the five Plaintiffs were permanently and totally disabled with the testimony of Mr. Paul *808 Melancon, a Rehabilitation Counselor and Vocational Expert, who testified that each of them was capable of returning to some form of employment. His finding that each Plaintiff was employable was supported by their treating physicians, each of whom testified that the Plaintiffs could do sedentary work in a controlled environment. Mr. Hebert reconciled this with his determinations in the following dialogue:
Q. Mr. Hebert, all of the treating physicians of these people have indicated they thought they were employable, and they thought it would be a good idea for them to try to go back to work, correct?
A. Dr. Lecorgne has never expressed that opinion.
Q. Well, the plastic surgeons have all felt that. Correct? Is that fair?
A. Yeah. That's the treatment of the outer body. The people treating the mind and inner body has [sic] said no.
Dr. Lecorgne is the psychologist who signed the Life Care Plans. Though Dr. Lecorgne signed the plans, he did not testify, nor were any of his reports offered into evidence. Future loss of earnings must be established to a reasonable degree of certainty.[55] We must discount any reasons Mr. Hebert gave which are physical, such as itching, ongoing treatment, and functionality, because physicians' testimonies did not support them. Physicians would be in a better position to assess these patients' physical limitations and ability to function. However, Mr. Hebert took into account such factors as each Plaintiff's mental capacity and previous work experiences, as well as physical limitations.
Mr. Hebert further supported his determinations by pointing out the distinction between "employability" and "placeability." Based on his professional experience, Mr. Hebert insists that the Plaintiffs will never be "placeable" because of the public's attitude in the "real world" towards people with disabilities. Mr. Melancon disagreed, stating that, in his experience, the enactment of the Americans with Disabilities Act (ADA) had effected a positive change in employer's attitudes towards hiring persons with disabilities. However, Mr. Hebert refuted the ADA's effectiveness with statistical information. He testified that the employment rate of people with severe disabilities actually dropped five years after the ADA was enacted. We agree with Mr. Hebert's assessment of these Plaintiffs' placeability as the law requires us to consider "whether and how much plaintiff's current condition disadvantages him in the work force."[56] (Emphasis added.)
Mr. Melancon stated that each of the Plaintiffs could earn wages of $6.00-$6.50, except for Mr. Perez whose capacity was a little less. However, he proposed no examples of appropriate jobs for any of them. The only support he offered for his conclusion was a U.S. Department of Labor report, stating that eleven percent of all jobs were considered "sedentary" and fifty percent are considered "light." This report has no bearing on the employment rate of disabled persons. It does not consider the particular needs of these Plaintiffs to work in a controlled environment, nor is it particular to our state. On the other hand, Mr. Hebert took into consideration each Plaintiff's specific limitations, as well as the job market in Louisiana.
"An expert's opinion is only as good as the facts upon which it is based."[57] *809 Mr. Melancon met with each Plaintiff only one time and personally met, only, with Dr. Robinson, a plastic surgeon who evaluated each Plaintiff on one occasion. Conversely, Mr. Hebert has had several meetings and phone conversations with these Plaintiffs over a six-year period, and he has met with physicians who have either treated or conducted several evaluations of them. As Mr. Melancon's testimony does not demonstrate how his conclusions are based on the particular facts of this case, his testimony in no way diminishes Mr. Hebert's conclusions, which clearly resulted from his analysis of each Plaintiff's individual circumstances. The record supports Mr. Hebert's projections which we find to be more reasonable. Accordingly, we accept them as a basis for our award of loss of earning capacity.
We award to Mr. Bonin $199,932.00 for his past loss of earning capacity. At the time of the fire, he had been laid off from SECO, where he had worked as an electrician's helper. He quit school in the eighth grade but completed a two-year course in electricity and obtained his certificate in 1989. He worked for Control Systematologists, Inc. for three years, doing an industrial type of electricity. He had also worked for Insulators, Inc. and Little Rock Electric. Based on this work history, Mr. Hebert assessed his earning capacity at $400.00-$500.00 per week. Mr. Hebert found that Mr. Bonin was unable to return to work after the accident, particularly in his area of training, because he had lost some fingers and had decreased functionality of both hands. We agree with Mr. Hebert that Mr. Bonin's injury prohibited him from working, at least, until February 15, 2001, which is when he passed away. Thus, we award him $199,932.00, Dr. Womack's calculated loss of earning capacity until his death, converted to present value.
LOSS OF CONSORTIUM CLAIMS-PARENTS
Loss of consortium claims are compensable under La.Civ.Code art. 2315. Most commonly, it is a spouse who brings a loss of consortium claim for injuries that another's actions has caused the other spouse. However, parents and children may also bring this cause of action. Parents must prove, beyond a preponderance of the evidence, that their child's injury caused them to experience one or more of the following: 1) loss of love and affection; 2) loss of society and companionship; 3) loss of performance of material service; 4) loss of financial support; 5) loss of aid and assistance; and/or 6) loss of felicity.[58] Initially, we recognize that no compensation is due to the parents for loss of love and affection due to the fire. The one positive aspect of this whole incident seems to be that it actually brought the Plaintiffs and their parents closer together.
Clarence and Sally Britt
Before the fire, Billy Britt lived with his parents, Clarence and Sally Britt. Ms. Britt testified that Billy would mow the lawn and help them around the house. She also said that, before the accident, he would help Mr. Britt with the farming and that they went everywhere together. She and Billy, both, stated that his move to Pennsylvania was the result of his going there on a visit and finding that the cooler climate was more comfortable for him. And of course, Mr. and Mrs. Britt are not able to see him as often since the move. They were with him when he was in the burn unit and they took care of him when he was released. We award Mr. and Mrs. Britt, each, $10,000.00 for loss of material *810 services, loss of aid or assistance, loss of companionship, and loss of felicity.
Wilfred and Loyce Kebodeaux
Jeffrey Kebodeaux testified that he was not able to help his parents around the house any more. He also stated that, before the accident, he was helping his dad in the hay business but can no longer do that. Mr. and Mrs. Kebodeaux were with Jeffrey the entire time he was in the burn unit, and they cared for him once he was released. Thus, we award Mr. and Mrs. Kebodeaux $5,000.00, each, for loss of material services, loss of aid or assistance, and loss of felicity.
Mildred and Melvin Thibodeaux
Mr. and Mrs. Thibodeaux were with their daughter, Angie, when she was in the burn unit. Ms. Thibodeaux testified that she helped Angie in the hospital and cared for her when she was released. Mr. Thibodeaux said that it was difficult for him to see Angie's confidence in herself dissipate after the fire and how she had the perception that everyone was always staring at her. Both, Mr. and Mrs. Thibodeaux testified to their increased concern for her safety after having gone through the trauma of this accident. We award Mr. and Mrs. Thibodeaux $3,000.00, each, for loss of felicity.
LOSS OF CONSORTIUM CLAIMS-CHILDREN
The elements of a minor child's claim for loss of consortium are the same as those of a parent's claim.[59]
Christopher Michael Leger
Mike Bonin had a son, Christopher Leger, who lives with his mother. A child's burden in a loss of consortium claim is also proof by a preponderance of the evidence that he suffered the kind of damages categorized as compensable in this type of claim. We, simply, do not find any evidence in record to support an award of damages for loss of consortium due to the fire. Therefore, we decline to award any damages to Christopher Leger.
Ashley Shay Benoit
Brent's parents, Clara Mae and Herman Benoit, have legal custody of his minor daughter, Ashley. Ms. Benoit testified that Ashley did not see Brent while he was in the hospital because he did not want her to see him there. She also said that when Brent first came home, Ashley was frightened and felt rejected when he had to stop her from trying to hug him because he was in such pain from the burns. We award Ashley Benoit $2,500.00 for loss of love and affection.
WRIGHT ENRICHMENT/CONTINENTAL INSURANCE REIMBURSEMENT CLAIM
At the time of the fire, Wright Enrichment employed Mr. Britt and provided him with a plan of insurance coverage, which it self-funded, in part, with Continental Casualty Insurance providing excess liability coverage. Wright Enrichment and Continental have paid a total of $355,709.38.00 in medical bills that Mr. Britt incurred due to injuries related to the fire. Of this amount, Mr. Britt reimbursed Wright Enrichment $12,000.00.
When he originally filed suit against Ferrellgas and its insurers, Wright and Continental (referred to collectively as "the Plan") intervened. The Plan claimed that it was legally and conventionally subrogated to Mr. Britt's right to seek relief to the extent of the amounts it had already expended for his medical care. Subrogation occurs when one person is substituted *811 to the rights of another.[60] In the instant case, this means if Mr. Britt had any rights to collect his medical expenses from a third party, the Plan, theoretically, would step into his shoes, so to speak, and obtain his right to recover to the extent it has paid money on his behalf. However, the Plan is not automatically entitled to seek reimbursement from the third party upon making the payments to Mr. Britt or on his behalf.[61] Therefore, the Plan's claim for legal subrogation must fall.
Nonetheless, its claim for conventional subrogation has merit. Conventional subrogation occurs when the contract of insurance between the insured and insurer specifically provides for it.[62] In the case at bar, the Plan's right of conventional subrogation is based upon the following provision of the insurance contract with Mr. Britt:
In the event any payment is made to or on behalf of a Participant covered under this Plan, the Plan, to the extent of such payments, shall be surrogated [sic] to all causes of action and rights of recovery such Participants [sic] has against any person or organization. Such subrogation rights shall extend and apply to any settlement of a claim, irrespective of whether litigation has been initiated. The Participant shall execute and deliver such instructions and papers as shall be requested by the Claims Administrator. Further, the Participant or the Participant's legal representative shall promptly notify the Claims Administrator of any settlement negotiations prior to entering into a settlement agreement. No waiver, release of liability, of other documents executed by the Participant without such notice to the Claims Administrator shall be binding upon the Plan, and failure to so notify the Claims Administrator will not prejudice the Plan's right to recover such payment from any person or organization to the fullest extent permitted by law.
Clearly, this provision gives the Plan a right of subrogation. Our determination of damages and allocation of fault casts judgment on Empire for thirty-five percent of Mr. Britt's damages, which include the medical costs that the Plan paid. Thus, the Plan is entitled to $124,498.28 from Empire and its insurers. Accordingly, we deduct this amount from Mr. Britt's award of damages. Ferrellgas and its insurers owe the Plan the remaining sixty-five percent, or $231,211.10. However, when Mr. Britt settled his claims with Ferrellgas and its insurers, he expressly released them "from any and all past or future claims, rights damages, costs, losses of services, expenses, and compensation of any nature whatsoever, whether based on tort, contract, or other theory of recovery[.]" Mr. Britt further agreed to "defend, indemnify and hold harmless [Ferrellgas and its insurers] from any claims, demands, obligations, actions, causes of action, damages, costs and expenses, including any and all medical liens, which exist or may exist resulting from the incident[.]"
Therefore, the issue becomes whether Mr. Britt's release precludes the Plan from asserting its claim against Ferrellgas, even though it paid these medical expenses before Mr. Britt settled his claims with Ferrellgas and its insurers. This court, in construing similar "release" provisions has found that the settlement agreement affects only the relationship between the *812 settling parties.[63] As such, the Plan may pursue its claim against Ferrellgas, the settlement agreement notwithstanding, and Ferrellgas would have to seek recourse from the Plaintiff, Mr. Britt.[64]
We recognize that a subrogee (the Plan) may lose the right to assert its claim when the tortfeasor and its insurer (Ferrellgas and TIG) effect a settlement, in good faith, having no notice or knowledge of the subrogee's claim.[65] That was not the situation in the instant case. Rather, at the time of the settlement, Ferrellgas and its insurer, TIG, who handled the settlement with Mr. Britt, were aware of the Plan's claim because it had intervened in the lawsuit. Ferrellgas and TIG, however, settled the claim without satisfying the Plan's intervention. The settlement agreement does not even mention the Plan's claim. Under these circumstances, the settlement agreement does not prohibit the Plan from pursuing its subrogation claim against Ferrellgas and TIG. We find, therefore, that the Plan is entitled to recoup the $231,211.10 from Ferrellgas and TIG, which represents sixty-five percent of the medical expenses it paid on Mr. Britt's behalf.
SUMMARY OF DAMAGE AWARDS
In summary, we award the Plaintiffs the following damages:

*813
Angela Thibodeaux Empire's Share (35%)
General Damages: $2,000,000.00
Past Medical: $ 169,532.10
Future Medicals: $ 481,129.00
Loss of earning capacitypast and future: $ 622,894.00
 ___________
Total Damages $3,273,555.10 $ 1,145,744.29
Brent Benoit Empire's Share (35%)
General Damages $2,250,000.00
Past Medical: $ 75,343.18
Future Medicals: $ 712,717.00
Loss of earning capacity, past and future: $ 427,241.00
 ____________
Total Damages $3,465,301.18 $ 1,212,855.41
Jeffrey Kebodeaux Empire's Share (35%)
General Damages $2,500,000.00
Past Medical: $ 238,005.44
Future Medicals: $ 781,838.00
Loss of earning capacity, past and future: $ 355,875.00
 _____________
Total Damages $3,875,718.44 $ 1,356,501.45
Michael Bonin Empire's Share (35%)
General Damages $1,750,000.00
Past Medical: $ 389,311.21
Future Medicals: $ 0.00
Loss of earning capacity, past: $ 199,932.00
 _____________
Total Damages $2,339,243.21 $ 818,735.12

*814
John Perez Empire's Share (35%)
General Damages $3,000,000.00
Past Medical: $ 336,132.87
Future Medicals: $1,330,533.00
Loss of earning capacity, past and future: $ 355,875.00
 ____________
Total Damages $5,022,540.87 $ 1,757,889.30
Billy Britt Empire's Share (35%)
General Damages $3,000,000.00
Past Medical: $ 418,730.62
Future Medicals: $ 948,178.00
Loss of earning capacity, past and future: $ 770,587.00
 ____________
Total Damages $5,137,495.62 $1,798,123.47

As we noted above, however, Wright Enrichment and Continental were subrogated to Mr. Britt's right to recover the amount from that which Empire owes, that Wright and Continental had paid on his behalf. Therefore, Empire is to pay $124,498.28 of the $1,798,123.47, which it owes Mr. Britt, to Wright and Continental rather than to Mr. Britt. Thus, Empire actually owes Mr. Britt $1,673,625.19.
We cast the costs of this appeal on Empire.
REVERSED AND RENDERED.
THIBODEAUX, J., concurs and assigns written reasons.
THIBODEAUX, J., concurring.
The majority proposes a 65% allocation of fault to Ferrellgas and a 35% allocation to Empire based on the analysis of the Watson factors. In doing so, it places heavy emphasis on factor No. 5. I am concurring because I do not subscribe to the view that this factor deserves more weight in all circumstances than the other four factors of Watson. The majority opinion may serve to imply such an idea.

ON REHEARING
WOODARD, Judge.
We grant the Plaintiffs' request for rehearing for the limited purposes of clarifying that National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union) is cast, in judgment, in solido, for all amounts against "Empire" (Empire Gas Corporation, Empire Gas, Inc. of Lake Charles) and of casting upon Empire and National Union costs of the lower court proceedings, including expert fees. The total amount cast is $35,212.87, as follows:

Dr. Hebert's expert witness fee $ 2,000.00
Dr. Douglas Womack's expert witness fee $ 2,000.00
Physician fees for medical depositions $12,374.00
Deposition/video reporting fees $11,572.62
Court reporters for trial services $ 7,266.25

*815 Further, we impose legal interest against Empire and National Union from the date Plaintiffs made judicial demand against Empire.[1]
On the contrary, Plaintiffs ask that we use September 8, 1995, when they first filed suit against Ferrellgas and its employee. However, we do not find that the cases, which Plaintiffs cited, justify imposing interest on Empire and National Union from September 8, 1995. These cases justify the imposition of legal interest before demand was made on the party cast in judgment, only, when there is a special relationship between the party sued in the original demand and the party, who was added at a later date, such as a party and his or her insurer.
Thus, the cases support the imposition of legal interest in the instant case against National Union from the date judicial demand was made against Empire, its insured, even though National Union was not yet a party on July 12, 1996. However, there is no relationship between Ferrellgas and Empire which can warrant the imposition of legal interest from the date of Plaintiffs' original demand against Ferrellgas.
When there are multiple defendants, generally, we impose interest on the party cast in judgment by calculating interest from the date judicial demand was made against that party.[2] Since Plaintiffs did not add Empire as a Defendant until July 12, 1996, we impose legal interest on, both, Empire and National Union from this date.
We find no merit to the issues that Empire and National Union raise in their application for rehearing. Accordingly, we deny their request.
REHEARING GRANTED IN PART, DENIED IN PART.
NOTES
[1] Thibodeaux v. Ferrellgas, Inc. 97-1267 (La. App 3 Cir. 7/29/98); 717 So.2d 668, writs denied, 98-2321, 98-2325 (La.11/13/98); 731 So. 266.
[2] See Thibodeaux v. Ferrellgas, Inc., 98-862 (La.App. 3 Cir. 1/6/99); 741 So.2d 34, writ denied, 99-366 (La.3/26/99); 739 So.2d 797.
[3] See Thibodeaux v. Ferrellgas, Inc., 00-2635 (La.9/20/00); 767 So.2d 707.
[4] Thibodeaux v. Ferrellgas, Inc., 02-754 (La. App. 3 Cir. 8/6/03); 855 So.2d 815.
[5] La.Code Civ.P. art. 1733(B).
[6] Ponderosa Assoc., Ltd. v. Verret, 97-1184, p. 6 (La.App. 3 Cir. 7/1/98); 714 So.2d 956, 959, writ denied, 98-2368 (La. 11/20/98); 728 So.2d 1290 (quoting Love v. Baden, 478 So.2d 1008 (La.App. 3 Cir.1985)).
[7] Miller v. Miller, 35,934, p. 9 (La.App. 2 Cir. 5/8/02); 817 So.2d 1166, 1172, writ denied, 02-1890 (La. 10/25/02); 827 So.2d 1154 (citing Precision Motors Inc. v. Beder, 273 So.2d 650 (La.App. 4 Cir. 1973)).
[8] Miller, 817 So.2d at 1172.
[9] See e.g. Ferens v. John Deere Co., 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990); Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).
[10] Van Dusen, 376 U.S. 612 n. 40, 84 S.Ct. 805, 11 L.Ed.2d 945.
[11] Ponderosa, 714 So.2d 956.
[12] Sharff v. Tanner, 486 So.2d 1047 (La.App. 2 Cir. 1986).
[13] La.Civ.Code art. 2315.
[14] Bordelon v. St. Frances Cabrini Hosp., 93-1331 (La.App. 3 Cir. 5/4/94); 640 So.2d 476.
[15] Roberts v. Benoit, 605 So.2d 1032 (La. 1991).
[16] Daye v. Gen. Motors Corp., 97-1653 (La.9/9/98); 720 So.2d 654.
[17] Id. at 1043.
[18] Home Gas & Fuel Co. v. Miss. Tank Co., 246 La. 625, 166 So.2d 252 (1964).
[19] See Domingue v. State, through Dep't of Public Safety, 490 So.2d 772, 775 (La.App. 3 Cir.1986).
[20] Task v. Gates, 00-99 (La.App. 3 Cir. 9/13/00); 770 So.2d 21, writ denied, 00-2858 (La. 12/8/00); 776 So.2d 467.
[21] Stobart v. State, through DOTD, 617 So.2d 880 (La.1993).
[22] Roberts, 605 So.2d at 1044.
[23] Id.
[24] Gresham v. Davenport, 537 So.2d 1144, 1147 (La.1989) (quoting Malone, Ruminations on Cause-In-Fact, 9 Stanford L.Rev. 60 (1956)).
[25] La.R.S. 40:1846.
[26] E.P. v. City of Lafayette, 98-802 (La.App. 3 Cir. 12/9/98); 722 So.2d 1182, 1185, writ denied, 99-86 (La.3/1/99); 739 So.2d 204 (quoting Hill v. Lundin & Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972)).
[27] La.R.S. 40:1846.
[28] Arcadian Corp. v. Olin Corp., 01-1060 (La. App. 3 Cir. 5/8/02); 824 So.2d 396, writ denied, 02-1930 (La.10/25/02); 827 So.2d 1174; Domingue, 490 So.2d 772.
[29] Perkins v. Entergy Corp., 00-1372 (La.3/23/01); 782 So.2d 606.
[30] Boykin, 707 So.2d 1225.
[31] Perkins, 782 So.2d 606.
[32] Id.
[33] Id. (citing Graves v. Page, 96-2201, (La.11/7/97), 703 So.2d 566).
[34] Id. (citing LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La. 1978)).
[35] Domingue, 490 So.2d at 775.
[36] West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La. 1979), cited in Smith v. State, through Dep't of Health & Hosp., 94-871 (La. App. 3 Cir. 2/15/95); 650 So.2d 450, writ denied, 95-693 (La.4/28/95); 653 So.2d 596.
[37] Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216.
[38] 469 So.2d 967 (La.1985).
[39] Id. at 974.
[40] La.Code Civ.P. art. 2164; Ayres v. Beauregard Elec. Co-op. Inc., 94-811 (La.App. 3 Cir. 9/6/95), 663 So.2d 127, writs denied, 95-2432, 95-2434 (La.12/15/95), 664 So.2d 455.
[41] Coco v. Winston Indus., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979).
[42] Mart v. Hill, 505 So.2d 1120 (La. 1987).
[43] Wainwright v. Fontenot, 00-492 (La. 10/17/00), 774 So.2d 70.
[44] Duncan v. Kansas City S. Ry. Co., 00-66 (La. 10/30/00), 773 So.2d 670, cited in LeBleu v. Safeway Ins. Co. of La., 01-1637 (La.App. 3 Cir. 5/22/02), 824 So.2d 422.
[45] Bergeron v. Mike Hooks, Inc., 626 So.2d 724 (La.App. 3 Cir. 1993).
[46] Creel v. Concordia Elec. Co-op., 95-914 (La. App. 3 Cir. 1/31/96), 670 So.2d 406, 412 (citing Superior Mining Co. v. Indus. Comm'n, 309 111. 339, 141 N.E. 165 (1923)).
[47] Squibb v. Century Group, 01-1527 (La.App. 3 Cir. 4/17/02), 824 So.2d 361, writ denied, 02-1405 (La.9/13/02), 824 So.2d 1173.
[48] Ceasar v. Stiner, 98-898 (La.App. 3 Cir. 12/9/98), 729 So.2d 611.
[49] Thibodeaux v. Bernard, 00-72 (La.App. 3 Cir. 11/02/00); 772 So.2d 897 (quoting Veazey, 587 So.2d 5).
[50] Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97); 696 So.2d 88.
[51] Veazey v. State Farm Mut. Auto. Ins., 587 So.2d 5 (La.App. 3 Cir.1991).
[52] Folse v. Fakouri, 371 So.2d 1120, 1123 (La. 1979).
[53] Batiste v. New Hampshire Ins. Co., 94-1467, p. 3 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95), 660 So.2d 472 (citing Hobgood v. Aucoin, 574 So.2d 344 (La. 1990)).
[54] Myers, 696 So.2d 88.
[55] Thibodeaux, 772 So.2d 897.
[56] Batiste, 657 So.2d at 170.
[57] Pierce v. Milford, 96-92 (La.App. 3 Cir. 9/25/96), 688 So.2d 1093, 1100 (quoting Quinones v. U.S. Fidelity & Guar. Co., 93-1648 (La.1/14/94), 630 So.2d 1303).
[58] Lachney v. Automotive Cas. Ins. Co., 94-704 (La.App. 3 Cir. 12/7/94), 647 So.2d 645.
[59] Detraz v. Hartford Accident & Idem., 94-708 (La.App. 3 Cir. 21/7/94), 647 So.2d 576.
[60] La.Civ.Code art. 1825.
[61] Martin v. La. Farm Bureau Cas. Ins. Co., 94-69 (La.7/5/94), 638 So.2d 1067.
[62] Id.; La.Civ.Code art. 1828.
[63] See State Farm Mut. Auto. Ins. Co. v. Manuel, 608 So.2d 1065 (La.App. 3 Cir.1992); State Nat'l Fire Ins. Co. v. Sykes, 527 So.2d 589 (La.App. 3 Cir.1988); Southern Farm Bureau Cas. Ins. Co. v. Sonnier, 406 So.2d 178 (La.1981).
[64] See e.g. Manuel, 608 So.2d 1065.
[65] Audubon Ins. Co. v. Farr, 453 So.2d 232 (La.1984), cited in Sykes, 527 So.2d 589.
[1] La.R.S. 13:4203.
[2] Cook v. Deshautreaux & Klein Pediatric Clinic, 315 So.2d 405 (La.App. 4 Cir. 1975).