STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

ELRIDGE MENARD AND PAULINE MENARD

VERSUS

FEDERATED MUTUAL INSURANCE CO., ET AL.

**********
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 02-65001
HONORABLE JAN MARIE TURK, DISTRICT JUDGE

**********
ULYSSES GENE THIBODEAUX
CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and J. David Painter, Judges.

**REVERSED AND RENDERED.**

Barney R. Aucoin
P. O. Box 2342
Lafayette, LA 70502-2342
Telephone: (337) 237-3971
COUNSEL FOR:
    Intervenor Appellee - Louisiana Farm Bureau Casualty Ins. Co.

Steven Claude Judice
Keogh, Cox & Wilson, Ltd.
P. O. Box 1151
Baton Rouge, LA 70821
Telephone: (225) 383-3796
COUNSEL FOR:
    Defendants/Appellees - Federated Mutual Insurance Co. and Joseph Curtis
    Aguillard

Donald Dale Landry
Gerald DeLaunay
Perrin, Landry, DeLaunay, Dartez & Ouellet
P. O. Box 53597
Lafayette, LA 70505
Telephone: (337) 233-5832
COUNSEL FOR:
    Plaintiffs/Appellants - Elridge Menard and Pauline Menard

THIBODEAUX, Chief Judge.

In this car accident case, Elridge and Pauline Menard appeal an adverse judgment pursuant to a jury verdict apportioning fault equally between Mr. Menard and the driver of the following vehicle who hit their car. They also appeal the jury's decision not to award any damages. Because we find that the tortfeasor, Joseph Aguillard, did not overcome the statutory presumption that the driver of the following vehicle is liable for such a collision, we hold him completely responsible for the accident. Additionally, Mr. and Mrs. Menard produced sufficient evidence showing that although the accident did not cause any new injuries, it aggravated pre-existing injuries. A tortfeasor is responsible for injuries caused by his negligence, even if the extent of the injury is an aggravation of a pre-existing injury or condition. Thus, the Menards are entitled to an award of damages and their past medical expenses. We award $50,000.00 in general damages and $42,476.95 in past medical expenses to Mr. Menard and $40,000.00 in general damages and $42,061.06 in past medical expenses to Mrs. Menard. We decline to award future medical expenses as these were too speculative in nature and because the accident aggravated pre-existing injuries and did not cause new injuries.

## I.

## **ISSUE**

We must determine whether the jury erred when it apportioned fault for the car accident equally to both Mr. Menard and Mr. Aguillard. We must also consider whether the jury abused its discretion when it declined to award any damages at all for aggravation of the Menards' pre-existing injuries.

II.

## FACTS

On April 17, 2001, Elridge Menard drove his wife, Pauline Menard, to the gym. As he waited to make a left turn into the parking lot, he was rear-ended by a van driven by Joseph Aguillard. Mr. Menard later testified that he waited about seven minutes before leaving the car after the accident. Mr. Aguillard, however, testified that Mr. Menard got out of his car right away and began taking photographs of the damage. Mr. Menard also stated that he immediately felt dizzy after the accident. He was taken to the hospital by ambulance. The EMT who attended to Mr. Menard testified that the hospital instructed him to start an IV because Mr. Menard's blood pressure was elevated.

A jury found that negligence on the part of both Mr. Menard and Mr. Aguillard caused the accident, and thus apportioned fifty percent fault to each. The jury also found that neither Mr. nor Mrs. Menard sustained any damages in the accident. The Menards now appeal the jury's verdict, arguing that Mr. Aguillard should be responsible for one hundred percent of the fault, and also that they are entitled to damages for their pain and injuries resulting from the accident.

III.

## LAW AND DISCUSSION

### *Liability of Mr. Menard and Mr. Aguillard*

Mr. Menard testified that both his turn signal and brake lights were working. He said he was stopped for approximately three to four minutes while waiting to make the left turn into the gym parking lot. In his deposition of July 2002, however, he stated he had been waiting for only twenty-five to thirty seconds before

2

impact. When confronted with this contradiction at trial, Mr. Menard stated that both estimations were only approximate times, but he reiterated that he was at a full stop.

Mr. Aguillard testified that, as he was driving behind Mr. Menard, he heard a rattling sound in his car and looked down to see what it was. He admitted he looked away from the roadway for "a couple of seconds." He admitted that before he looked down, he saw brake lights on Mr. Menard's car, but did not recall that Mr. Menard's turn signal was on. He could not say whether, upon looking back at the road, Mr. Menard's turn signal was on, nor could he say whether the car was at a complete stop, although he again acknowledged seeing brake lights.

Officer Kirkwood, who arrived at the accident scene, testified that the weather was clear that day. According to his report, Mr. Aguillard told Officer Kirkwood that Mr. Menard's car had come to a sudden stop, so that it was too late to avoid impact once Mr. Aguillard looked back at the road. Mr. Aguillard also told Officer Kirkwood that Mr. Menard's car did not have a left turn signal on. Officer Kirkwood inspected both cars, but he did not check to see if the signal lights or brake lights were working on the Menard car. Although he did not issue any citations to either Mr. Menard or Mr. Aguillard, Officer Kirkwood's report concluded that the primary cause of the accident was careless operation by Mr. Aguillard.

Louisiana Revised Statutes 32:81(A) requires that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." Thus, a following motorist involved in a rear-end collision is presumed to have breached this statutory duty. *Mart v. Hill*, 505 So.2d 1120 (La.1987). A following motorist may, however, rebut the presumption by demonstrating that he or she had his car under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances, or by proving that

3

the driver of the lead car negligently created a hazard which the following motorist could not reasonably avoid. *McCullin v. U.S. Agencies Cas. Ins. Co.*, 34,661 (La.App. 2 Cir. 5/9/01), 786 So.2d 269. The following motorist bears the burden of showing he was not negligent. *Wheelis v. CGU Ins.*, 35,230 (La.App. 2 Cir. 12/7/01), 803 So.2d 365.

The allocation of fault is a factual determination subject to the manifest error rule. *Spiller v. Ekberg*, 00-130 (La.App. 5 Cir. 5/17/00), 762 So.2d 226. Where there is conflicting testimony, reasonable evaluations of credibility and fact will not be disturbed on review, even though the appellate court believes its own assessments are as reasonable. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The appellate court must determine not whether the factfinder was right or wrong, but whether its conclusion was reasonable. *Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993). When two equally rational views of the evidence exist, the factfinder's choice of one cannot be manifestly erroneous or clearly wrong. *Id.*

In this case, however, Mr. Aguillard admitted he turned his attention away from the roadway, however briefly. He also admitted he saw at least Mr. Menard's brake lights before he looked away, although there was some dispute as to whether the left turn signal was on. Furthermore, Mr. Menard had been waiting to make the left turn for at least twenty-five to thirty seconds, by his more conservative estimate, before the collision. There was no evidence of any obstructions in the roadway, and the weather was clear. Although Officer Kirkwood did not inspect Mr. Menard's lights or turn signals, he did not issue citations to either Mr. Menard or Mr. Aguillard. Officer Kirkwood concluded that Mr. Aguillard's inattention caused the accident. Mr. Aguillard failed in his burden to show he was not negligent and thereby rebut the presumption of liability. Because he did not sufficiently refute the

presumption, it is unreasonable to consider him anything other than one hundred percent liable for the accident.

### *Damages*

Pauline Menard consulted five doctors over the course of her treatment after the April 2001 accident. She first saw Dr. John Budden on April 23, after the car accident, and again on May 18. She complained of severe neck and back pain. She admitted she had back surgery four years earlier to treat a ruptured disc related to a car accident, and that this injury had always caused her pain, but that after the April 2001 accident, her pain was present continuously, and as severe as a nine on a scale of ten. She also admitted she had been in an accident only a few months earlier, in January 2001, and that that accident aggravated her back. However, Mrs. Menard stated that she had been improving since the January 2001 accident, until the April 2001 accident. Dr. Budden did not assign a disability rating, nor did he discuss limitations on activities. In his opinion, Mrs. Menard was not a candidate for surgery, but he did prescribe pain medication and advised her to continue physical therapy. Her physical exam was objectively normal, and showed normal range of motion and no signs of muscle spasms, but her X-rays revealed degenerative changes in her lumbar spine. While Dr. Budden believed the degenerative changes revealed in the X-rays were present before the April 2001 accident, he concluded the accident aggravated these pre-existing problems.

Dr. John Watermeier first saw Mrs. Menard on June 27, 2001. She complained of moderate to severe lower back pain and also right knee pain. She admitted her prior back surgery, saying it was related to an accident at work. She did not, however, report prior car accidents. In January 2002, Dr. Watermeier performed knee surgery on Mrs. Menard, and found moderate to severe deterioration of the knee.

He explained that while this defect is usually due to the normal aging process, trauma to the knee can aggravate such a condition and cause defects. He concluded that the defect in Mrs. Menard's knee was a pre-existing condition aggravated by the April 2001 accident. Her knee stabilized and improved after surgery.

X-rays of Mrs. Menard's back were taken in February 2002, and showed some degenerative changes at the L4-L5 level of her back. Although he was not able to compare the February 2002 X-rays with previous X-rays, Dr. Watermeier believed the degenerative changes pre-dated the April 2001 accident. He concluded, however, that the April 2001 accident had aggravated this prior condition. Dr. Watermeier also compared an MRI of Mrs. Menard's lumbar spine from September of 2001 with MRIs of the same area from May 1998 and March 1997. He noted that while the September 2001 MRI report indicates degeneration of her spine at several levels in her lower back, both previous MRIs showed the same condition. He again concluded that the April 2001 accident aggravated Mrs. Menard's prior degenerative condition. Although Dr. Watermeier suggested surgery to treat her lower back pain, he also believed she was doing well with conservative treatment, which included injections of a local pain reliever.

Dr. Joseph Gillespie first saw Mrs. Menard on November 19, 2003. She complained of lower back pain, tenderness, and pain, numbness, and tingling in her legs. She indicated a history of lower back problems and had had surgery at the L4-5 level. She did not specify other car accidents, but said she had once fallen and injured herself at work. Dr. Gillespie examined her and observed a significant surgical scar on her lower back. He noted that scar pain, particularly in people with subsequent trauma such as a car accident, can result in lower back and leg pain. However, injections to the scar did not improve her pain. Dr. Gillespie concluded she suffered from post-surgical back pain and degenerative disc disease exacerbated by the April

6

2001 car accident. He believed, however, that she was functioning well, and that her pain could be controlled with medications and certain epidural injections.

Dr. Bryan LeBean first saw Mrs. Menard in January 2003. Her chief complaints were lower back pain and right knee pain. She told him she had had lower back surgery in 1997, but did not tell him about any car accidents other than the April 2001 accident.

Dr. LeBean examined her and found that her back and her right knee were both severely tender, and that she suffered from decreased range of motion in her knee. She complained of lower back pain of an eight on a scale of ten and knee pain of three on a scale of ten. He diagnosed Mrs. Menard as having prior lumbar disc herniation aggravated by the April 2001 accident. Dr. LeBean specifically related the aggravation to the accident, even though the original condition pre-dated the accident.

Elridge Menard consulted five doctors in relation to his treatment for the April 2001 accident. He admitted to Dr. Budden he had been previously injured in car accidents in 1987, 1999, and January 2001. Although he told Dr. Budden his neck had completely recovered from that accident, he was still experiencing lower back pain from the January 2001 accident, which he described as having increased in severity after the April 2001 accident. Dr. Budden's objective findings during his physical examination of Mr. Menard were relatively normal. He did note that some of Mr. Menard's extremities were slightly less responsive than normal, but that could be attributable to Mr. Menard's diabetes. X-rays taken on the date of the accident were negative, and Dr. Budden did not order any MRIs or any further X-rays. Dr. Budden concluded Mr. Menard had sustained cervical and lumbar strains. He did not recommend surgery, but did prescribe some medication and physical therapy, which appeared to decrease Mr. Menard's back pain slightly. The physical therapy report

7

of May 22, 2001 noted that Mr. Menard appeared to be very functional and did not show any significant signs of distress. Dr. Budden did not assign a disability rating.

When asked whether he believed Mr. Menard was malingering or exaggerating his symptoms, Dr. Budden admitted that while his subjective complaints were quite severe, his objective findings were absent. However, he noted that this disparity between subjective complaints and objective findings was not unusual in cases of lumbar strain. Finally, Dr. Budden noted that his focus in treating Mr. Menard was his neck and back pain, and not his hypertension.

Mr. Menard's main complaints to Dr. Watermeier were mild to moderate lower back pain, mild neck pain, and pain in his left shoulder. He admitted to prior accidents and injuries in 1997, 1999, and 2000, but did not disclose the January 2001 accident. Dr. Watermeier described his objective findings as relatively benign, noting that Mr. Menard had some full range of motion in his lower back and shoulders, but mild limitation and pain in his neck. His X-rays were normal. Dr. Watermeier suspected Mr. Menard had suffered a herniated disc in his lower back as a result of one of his prior accidents, and concluded that he had sustained an aggravation to a pre-existing herniated disc and possibly a new injury based on his symptoms in his lower back, neck, and left shoulder.

An MRI of Mr. Menard's lumbar spine in August 2001 indicated a herniated disc at L4-5 and bulging discs at L3-4 and L5-S1. An MRI of his cervical spine in September 2001 showed a herniated disc at C6-7. Dr. Watermeier was able to compare an MRI of the lumbar spine from February 2000 with the post-April 2001 MRIs, and found that the 2000 MRI report described findings very similar to the subsequent MRI. He concluded that Mr. Menard sustained an aggravation to a pre-existing condition to the lumbar spine, without any evidence of new injury. An MRI of his left shoulder revealed a fracture, but Dr. Watermeier concluded this was an old,

8

chronic defect, present long before the April 2001 accident. He believed, however, that there was an aggravation to this pre-existing condition in Mr. Menard's left shoulder.

Over the course of Mr. Menard's next visits, from September 2001 to November 2002, Dr. Watermeier recommended epidurals to relieve the pain from the herniated disc in the lumbar spine and surgery to treat his neck pain. Mr. Menard declined both procedures, opting instead for medication and periodic injections of pain medication. He also declined surgery for his shoulder. The surgeries could cost up to $50,000.00. Dr. Watermeier described the surgeries as elective, and noted that the conservative treatment, while not curative, has been palliative. He did not place any limitations or restrictions on Mr. Menard, as far as work or daily activities, nor did he assign a disability rating to him.

Like Dr. Budden, Dr. Watermeier believed that although Mr. Menard's injuries were not themselves related to the April 2001 accident, that accident aggravated his pre-existing conditions, specifically his lumbar disc herniation and his shoulder. Dr. Watermeier also admitted to inconsistencies between his objective findings and Mr. Menard's subjective complaints, but noted this was not unusual, and also stated it was possible to have a problem that did not manifest itself in a physical exam.

Dr. Gillespie first saw Mr. Menard in November 2003. His chief complaints were headache, neck, and back pain. Although he did not mention the January 2001 accident, Mr. Menard did admit he had been involved in prior car accidents, which had resulted in neck and back pain that remained occasional. Dr. Gillespie performed a physical exam and found mild tenderness in Mr. Menard's neck and back, but otherwise Mr. Menard seemed normal and not in any significant distress. Dr. Gillespie reviewed findings from the August 2001 MRI of Mr. Menard's

lumbar spine, and found evidence of herniation and bulging at L4 and L5-S1. The September 2001 MRI of the cervical spine revealed a herniation at C6-7, but Dr. Gillespie concluded that these changes were not significant. The MRI of Mr. Menard's left shoulder showed some degenerative changes, but these indicated a chronic, rather than a new, defect. Overall, Dr. Gillespie felt that Mr. Menard had chronic, pre-existing problems with pain that were exacerbated by the April 2001 accident. He prescribed pain injections, but Mr. Menard chose not to receive them, opting instead for medication. Dr. Gillespie also stated that the presence of degenerative changes in Mr. Menard's neck and back would preclude heavy duty labor.

Dr. Gillespie also discussed Mr. Menard's hypertension, noting that Mr. Menard had some history of mild or borderline hypertension, and had taken medication for this condition in the past. He noted that a variety of factors can contribute to hypertension, including diabetes. Dr. Gillespie, however, did not believe that a stressful event could produce chronic hypertension. Chronic pain, however, could exacerbate hypertension. Dr. Gillespie also discussed Mr. Menard's erectile dysfunction (ED), noting that it was unlikely ED would result directly from any of his injuries since it would require a fairly significant trauma to produce such a result. He named hypertension, hypertensive medications, and diabetes as alternative causes of ED. Dr. Gillespie admitted, however, that he would defer on these matters to the opinion of a doctor who specialized in internal medicine, and would have more expertise on conditions such as hypertension.

Finally, Dr. LeBean, who has treated Mr. Menard since 1999, testified. Mr. Menard's main complaints during their visit in May 2001 included neck pain, shoulder pain, low back pain, and tension headaches. Dr. LeBean discovered severe tenderness in his neck and lower back, and moderate tenderness and decreased range

of motion in his left shoulder. In addition, his blood pressure was elevated. Dr. LeBean was aware that Mr. Menard had prior problems with his lower back and neck. In fact, based on reports from other doctors, Dr. LeBean stated that Mr. Menard had been diagnosed in 1997 with a bulging disc on L5-S1. Therefore, he had lumbar disc herniation which pre-dated the April 2001 accident. However, Dr. LeBean agreed that that accident aggravated his back problem, exacerbating symptoms of pain. Dr. LeBean believed the shoulder pain was secondary to the cervical disc herniation. Dr. LeBean was concerned there could be further damage, and advised Mr. Menard not to return to work, with the exception of one period in which his condition improved slightly. Mr. Menard's symptoms of pain and Dr. LeBean's treatment and impression of cervical and lumbar strain remained consistent during all of his visits, through his most recent visit in March 2004.

Dr. LeBean believed that, more probably than not, the treatment and medications he administered to Mr. Menard were related to the April 2001 accident. Even when specifically told of the January 2001 accident, Dr. LeBean still related Mr. Menard's complaints to the April 2001 accident, and did not consider the January accident significant to his assessment of Mr. Menard. Additionally, Dr. LeBean stated that although Mr. Menard had been diagnosed with lumbar herniation before the accident, the April accident aggravated his pre-existing condition. Dr. LeBean stated that an MRI of the cervical spine in February 2000 was completely negative, so that a diagnosis of cervical disc herniation was a new event that occurred sometime after that MRI.

Dr. LeBean stated that Mr. Menard would not improve further with only conservative treatment, and would suffer from a chronic pain in his neck and shoulder, and lower back. However, Dr. LeBean believed Mr. Menard's preference

11

for more conservative treatment, opting for medication rather than surgery, was reasonable given the risks and expense of surgery.

In contrast to Dr. Gillespie's opinion, Dr. LeBean stated that Mr. Menard's hypertension was related to the April 2001 accident, stating that patients sometimes can have that reaction. Dr. Gillespie prescribed blood pressure medication, and stated that Mr. Menard's ED may be a side effect of that medication. In particular, Mr. Menard's complaints regarding ED began after he started that particular medication. Dr. Gillespie prescribed Viagra. In his deposition, Dr. Gillespie stated he believed the necessity of prescribing Viagra was related to the April 2001 accident, because the accident triggered Mr. Menard's high blood pressure condition, requiring medication which stabilized his high blood pressure, but induced ED.

Dr. Budden was the only doctor who treated Mrs. Menard who was aware of her accident during January 2001, and admitted her physical abnormalities pre-dated the April 2001 accident, but nevertheless concluded they had been aggravated during that event. Dr. Watermeier concluded that the April 2001 accident was responsible for aggravating her knee condition to an extent that necessitated surgery to diagnose and correct the condition. He also concluded that her back pain was a result of degenerative defects present prior to the April 2001 accident, but was aggravated by that event. Dr. Watermeier was not aware of her January 2001 accident, but he believed there was objective evidence to support her subjective complaints of pain. Dr. Gillespie was not aware of other car accidents, specifically of the January 2001 accident, and admitted he had no knowledge of whether epidurals would be medically necessary before April 2001. He agreed, however, that the April 2001 accident exacerbated her back condition. Dr. LeBean specifically related her back pain to the accident. None of the doctors changed their view that the April 2001

12

accident exacerbated Mrs. Menard's back pain, requiring pain medication. Additionally, it is clear that the accident aggravated Mrs. Menard's pre-existing knee condition to such an extent that it required surgery to treat.

None of the doctors who treated Mr. Menard thought he was malingering. Drs. Budden and Watermeier stated that inconsistencies between objective findings and subjective complaints were not dispositive of the true physical state of the patient. All of the doctors agreed that Mr. Menard's back and neck pain were pre-existing conditions exacerbated by the April 2001 accident. Even Dr. Budden, who was aware specifically of the January 2001 accident, reached this conclusion. Although Dr. Gillespie did not believe a single incident, such as a car accident, could push a borderline hypertensive patient into true high blood pressure, he agreed to defer to the opinion of a doctor who specialized in such issues. Dr. LeBean stated Mr. Menard's hypertension was a result of the stress of the April 2001 accident. As a result of medication taken to treat his hypertension, Mr. Menard developed ED.

Mrs. Menard stated that she was unable to do things she had once enjoyed, such as going dancing with her husband. She also stated that her daughter must do the housework, under her guidance. She has been dependent on pain medication and has had difficulty sleeping. Mr. Menard noted that he was unable to ride horses. He also has been unable to perform the full range of his duties as a private investigator, and his income has suffered as a result. In addition to unremitting pain from his physical condition, he has been forced to endure the effects of ED.

In general, an appellate court must review an award of damages for an abuse of discretion. The appellate court may only raise or lower the award to the nearest reasonable amount. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1997).

13

However, the Coco standard does not apply when the jury has made no award at all. *Bonin v. Ferrellgas, Inc.*, 02-1031 (La.App. 3 Cir. 8/6/03), 855 So.2d 781. In such a circumstance, "the appellate court should make a res nova determination of the appropriate total amount of damages to be awarded to the plaintiff for the injuries sustained." *Leal v. Dubois*, 99-957, p. 10 (La.App. 3 Cir. 4/5/00), 756 So.2d 684, 691, citing *Mart v. Hill*, 505 So.2d 1120. Thus, because the jury made no compensation for the injuries suffered by Mr. and Mrs. Menard as a result of the accident, we are permitted to do so. A tortfeasor "is responsible in damages for consequences of his tort even if damages so caused are greater because of prior condition of victim which is aggravated by the tort." *Burnaman v. Risk Mgmt., Inc.*, 97-250 (La.App. 3 Cir. 6/18/97), 698 So.2d 17, *writ denied*, 97-1832 (La. 10/31/97), 703 So.2d 23. Thus, the presence of pre-existing injuries or degenerative conditions in Mr. and Mrs. Menard's medical history does not preclude responsibility for any aggravation or exacerbation of those injuries as a result of the April 2001 accident.

Defendants attempted to cast doubt on the causal link between the April 2001 accident and the subsequent injuries and pain by suggesting that an accident in January 2001 could be responsible for those injuries. However, in *Lancon v. State Farm Mut. Ins. Co.*, 94-256 (La.App. 3 Cir. 10/5/94), 645 So.2d 692, *writ denied*, 95-153 (La. 3/17/95), 651 So.2d 272, the third circuit reviewed a case in which the defendant in a car accident lawsuit took the position that an accident between the injured plaintiff and a third party five weeks after the accident between the plaintiff and the defendant was actually responsible for aggravation of plaintiff's pre-existing condition. The court stated that the defendant had the burden of proving that the second accident was responsible for the injuries, but did not meet this burden. The defendants argued that none of the plaintiff's doctors could testify with medical certainty that it was the first accident, and not the second, which aggravated her

condition. The court stated, however, that merely raising the possibility is insufficient to prove an intervening cause, which must instead be proven by a preponderance of the evidence." *Id.*, citing *Turner v. Nationwide Ins. Co.*, 503 So.2d 734 (La.App. 3d Cir. 1987).

In this case, merely raising the fact of the January 2001 accident is insufficient to deflect causation and consequent responsibility for damages. While the doctors who testified acknowledged a complete medical history, including past trauma or injuries, was beneficial to diagnosis and treatment, none of the doctors changed their testimony. In fact, Dr. LeBean specifically did not believe the January 2001 accident was relevant to his diagnosis. All of the doctors believed the April 2001 accident aggravated the Menards' pre-exisiting conditions. The defendants did not offer any contradictory medical opinions or evidence. While they point out that Dr. Jarrott predicted the January 2001 accident would aggravate injuries they had suffered in the past, this does not shift causation away from the April 2001 accident.

Mr. Menard's medical bills totaled $42,476.95; Mrs. Menard's totaled $42,061.06. General damages cannot be fixed with purely objective certainty. *Wainright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. They "involved mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." *Duncan v. Kansas City*, 00-66 (La.10/30/00), 773 So.2d 670, cited in *LeBleu v. Safeway Ins. Co.*, 01-1637 (La.App. 3 Cir. 5/22/02), 824 So.2d 422). Together, the Menards made over thirty visits to four different doctors. Mrs. Menard endured a painful knee surgery, and was no longer able to go dancing with her husband. She was forced to rely on her daughter to help with housework. Mr. Menard endured consistently severe pain, and was forced to give up horseback riding. In addition, he suffered from the side effects of his hypertension medication.

He also has been unable to perform the full extent of his duties as a private investigator. Thus, in addition to awarding them these past sums in medical expenses, we award $50,000.00 to Mr. Menard and $40,000.00 to Mrs. Menard in general damages.

## IV.

## <u>CONCLUSION</u>

For the above reasons, the jury verdict is reversed and judgment as provided above is rendered on behalf of Elridge and Pauline Menard. Costs of appeal are assessed to Federated Mutual Insurance Company.

**REVERSED AND RENDERED.**